EDWARD MOORE, Trading as MOORE BROS., Plaintiff, *v.* AMERICAN MOLASSES COMPANY OF NEW YORK, Defendant.

(Supreme Court, Albany Trial Term, February, 1919.)

Contracts — breach of — meaning of " full requirements for one year "— damages — judgment in favor of plaintiff granted.

On May 1, 1915, defendant agreed to furnish plaintiff " full requirements for one year " of a certain brand of " Porto Rico Feed Molasses " at ten cents a gallon, and during the first five months did furnish each month from 21 to 34 barrels, but about the middle of October, 1915, prompted by the war conditions and facing a rapidly rising market, it wrote plaintiff a letter in which, after referring to the existing situation, it stated its willingness to protect plaintiff up to 843 barrels, the amount shipped out on orders under the contract of the

year before, which was in exactly the same form as the present contract. Plaintiff's letter in reply indicated that he did not approve of defendant's suggestion and, though he refused to agree that defendant should not be called upon to increase more than fifteen per cent over the amount ordered by plaintiff. during the previous year, the contract relation of the parties continued until the amount ordered and received was more than said fifteen per cent and largely in excess of any amount ordered by plaintiff in any one year during the time the parties had dealings. On February 12, 1916, defendant wrote a letter to plaintiff, informing him that up to that time he had withdrawn 964 barrels, approximately the fifteen per cent, and that in the circumstances defendant considered the contract completed and that on any further orders based on present market value, from twenty to twenty-five cents a gallon, it was entitled to the advance in price. The ruling market price of the kind of molasses called for in the contract from February 12, 1916, after which defendant refused to make further delivery, to May 1, 1916, had not been less than twenty cents per gallon. During the last three months covered by the contract, plaintiff ordered 2,773 barrels, 727 more than in the four years next preceding the contract. In an action to recover, for the alleged breach of the contract, the difference between the contract price per gallon and the market price, aggregating $15,251, *held*, that while defendant was under no legal obligation to deliver an unlimited amount of molasses, plaintiff was entitled to receive after February 12, 1916, so much as was actually required to meet the reasonable, ordinary and fair demand of his business, and his damages amount to $5,351, for which amount judgment in favor of plaintiff may be entered.

TRIAL had before the court without a jury in action for damages sustained by breach of a contract.

Herrick & Herrick (Charles J. Herrick, James J. Farren, of counsel), for plaintiff.

Leo Levy (Robert C. Poskanzer, of counsel), for defendant.

RUDD, J. Plaintiff seeks recovery for damages alleged to have been sustained by breach of a contract on the part of the defendant, which contract was made in writing on or about the 1st day of May, 1915, and reads as follows:

" THE AMERICAN MOLASSES CO. OF N. Y.
" 111 Wall Street, New York.
*May 1st*, 1915.
" Sold to THE MOORE BROS. OF ALBANY.
"Albany, N. Y.

" Terms
" Net Cash.

| Quality | Mark or Number | Price To be Branded |
|---|---|---|
| Their full requirements for one year to May 1, 1916. | "Milkmore" Brand. Porto Rico Feed Molasses. | 10c. per gal. in straight carloads to one consignee; 10½c. per gal. less quantities. |
|  | Common Blackstrap. Common Blackstrap. | 9c. per gal. in straight carloads to one consignee; 9½c. per gal. in less quantities. |

" Conditions F. O. B. New York. To be shipped as per purchaser's orders and billed as shipped.
" THE AMERICAN MOLASSES CO. OF N. Y.
" Ship via.                Per A. W. HAUSSTIN."

This contract is similar in form to a contract entered into covering the year preceding. The parties had been dealing with each other for some years.

There is no difficulty in the interpretation of this contract between the parties except as to the quantity which under the contract the defendant undertook to sell and deliver to the plaintiff. There is a sharp contention as to what the expression " Their full requirements for one year to May 1, 1916," means.

Supreme Court, February, 1919. [Vol. 106.

There is in addition somewhat of a difference between the parties as to the effect upon the questions here involved of the words " terms net cash."

We will dispose of the last suggestion before taking under consideration that which the court deems to be the really important question.

There is interposed a defense that the plaintiff violated the contract by failing to make payment as each shipment of molasses was made, the defendant contending that the contract required net cash payment upon shipments as made, and that thereby the plaintiff breached the contract.

Previous to the contract in question there had been five other annual contracts entered into between these parties, and the term or expression " net cash " was used in each contract.

From the beginning of the dealings between the parties plaintiff ordered goods without sending remittance covering the payment therefor. The defendant sending a bill covering each month's shipments, the bill thus rendered was paid by the plaintiff about the middle of the month following. That had come to be the custom of dealing between the parties.

There was no objection made by the defendant to such method. This had come to be in effect the construction put upon this contract by the parties thereto as to the payment for goods.

The contract in question does not differ at all in this regard from previous contracts and the method of payment under this contract had been the same as under the others.

What the parties did in the several years of dealings under a contract exactly in form with the one under consideration is, and certainly should be, the best way for the court to determine what in that regard the parties meant one with the other.

We will therefore find that in regard to the payment for goods delivered the plaintiff did not make a breach of the contract, and proceed to the consideration of the real question in the case, which is what quantity of molasses was the defendant obliged to furnish under the contract in order to meet the plaintiff's '' full requirements '' for the year.

Under the first contract entered into there was covered a period from December 5, 1911, to May 1, 1912, and the quantity stipulated as the plaintiff's requirements was not to exceed 500 barrels. Under this contract the plaintiff called for 252 barrels.

Under the contract expiring May 1, 1913, the quantity was the requirements of the plaintiff not to exceed 800 barrels; the plaintiff required 493 barrels, which the defendant furnished.

Under the contract expiring May 1, 1914, the same quantity as the last contract, namely, not to exceed 800 barrels, was specified, the defendant delivering 466 barrels, 27 less than the year previous.

In October, 1913, there was made an additional contract which covered one grade of molasses, and the quantity provided for was '' Their requirements to January 15, 1914,'' and under this supplemental contract there was ordered eleven barrels.

The next contract entered into covered a period of a whole year; it ran from May 5, 1914, to May 1, 1915, and it provided that the defendant was to furnish plaintiff '' full requirements for one year to May 1st, 1915.''

Plaintiff's requirements for the year amounted to 824 barrels.

The contract involved in this litigation was made May 1, 1915, and was exactly in form with the one made in May, 1914, and under this contract, which the plaintiff claims the defendant broke, there had been deliv-

ered between May, 1915, and February, 1916, 972 barrels.

On February 12, 1916, the defendant addressed a letter to the plaintiff of which the following is a copy:

"*Feb.* 12, 1916.

"Mess. Moore Bros. of Albany,
Albany, N. Y.:

"Gentlemen.—We have before us one of your postal cards issued February first, quoting out prices on Feeding Molasses, the Milkmore brand at 13½¢ and Devon brand at 12½¢ f. o. b. New York, and stating on same that you have about 1000 bbls. to offer at this price. Also that these prices are from 5¢ to 7¢ per gal. below the present market. Altogether the postal card indicates an extraordinary effort to drive in business, and that this in a measure has been successful, is very evident from the orders that have been coming in from you for the past week.

"Now we do not consider this fair, or consistent with the understanding that we came to, when we called your attention to this matter some time ago. You promised at that time you did not have any intention of taking undue advantage of the liberal form of our contract, and we on the other hand agreed to take care of your legitimate and natural requirements, governing the same by the amount of molasses you took out last year, and adding to it a normal increase of 10% to 15% for natural expansion, and increase in business.

"We have just gone over our records again, and find on your contract which expired May 1st, 1915 that the total amounted to 842 bbls. Up to the present on the contract which will expire on May 1st of this year you have withdrawn 964 bbls. This figures approximately 15% and we consider under the circumstances and in view of our understanding, that we can now consider this contract completed, and that we are

entitled to the advance in price on any further orders based on the present market value.

                    " Yours respectfully,
                " THE AMERICAN MOLASSES CO. OF N. Y.
"AWH.CP "

From this time on the defendant refused to deliver molasses to the plaintiff.

Between that time and the first of May next following, which was the unexpired period of the contract, the plaintiff ordered from the defendant molasses in the following quantities: February, 1916, 343 barrels; March, 1916, 1,120 barrels; April, 1916, 1,310 barrels. Total, 2,773 barrels.

The plaintiff seeks to recover, as damages for the alleged breach, the difference between the purchase price per gallon and the market price for the 2,773 barrels of fifty-five gallons each, which aggregates in amount $15,251.

The contract price at which the defendant agreed to sell the molasses was "10¢ per gal. in straight carloads to one consignee " and "10½¢ per gal. less quantities " for what is known as Porto Rico Feed Molasses of the " Milkmore " brand and for molasses known as Common Blackstrap " 9¢ per gal. in straight carloads to one consignee; 9½¢ per gal. in less quantities."

The ruling market price for molasses of the character specified in this contract during the period from February 12, 1916, after which the defendant refused to deliver, to May 1, 1916, the expiration of the contract, was twenty cents per gallon. It was not less than that. It ranged during that period sometimes to a higher market price.

The condition of the world markets was unusual, not only with reference to molasses but also we may fairly say with reference to all commodities. The conditions

were not only unusual but the circumstances were extraordinary. There seemed to be no shortage of supply; that is, there was, so far as this record discloses, no shortage in the product if times had been normal, but there was a tremendous increase in demand, because of the fact that it was discovered that molasses could be used in some way effectively in the manufacture of munitions of war.

At this time the concentrated effort of the world was along the line of war activities, the thought, the conscience, the physical and mental effort, were all strained as never before in a consecrated resolve not only to fight but to win the war. Individual and united efforts were following the same path, the scientist and the laborer stood side by side to do all that was in them for the same accomplishment.

So it happened that the demand for molasses, which has always been a highly valuable commercial product, was supplemented and intensified by the use to which it might be put through scientific treatment, as an aid in the struggle in which the peoples of the world were engaged.

Thus the market value or price increased, as above stated.

The defendant is a large dealer in molasses and the proof shows that it purchased the entire product of the Island of Porto Rico, so that it had for sale all of the Porto Rico molasses.

There is no indication that that quantity was less than in previous years.

There has evidently been in the years past no differences between these parties in the executing of the contracts into which they have entered.

The defendant has sold to the plaintiff, at a contract price, in other years all of the molasses which the plaintiff desired and for which the plaintiff had a

market. Several of the years the plaintiff did not call upon the defendant to furnish the amount to which the plaintiff was entitled under the contract. The year in question is different.

In the carrying out of the contract there was during the first five months, May to and including a portion of September, what apparently was an ordinary business in amount, the plaintiff calling upon the defendant for quantities in each month respectively of from twenty-one to thirty-four barrels. In October the defendant furnished to the plaintiff one hundred and ninety-eight barrels, and on the 16th of October the plaintiff received from defendant a letter referring to the contract, in which the defendant says:

" In view of the unusual conditions now prevailing, we find it absolutely necessary in order to protect ourselves to ascertain as definitely as possible the extent of our obligations in respect to this grade of molasses. Looking over our records of the business we did with you during the period from May 1, 1914 to May 1, 1915, we find the total amount of orders shipped out to be 843 bbls., and we are willing to protect you for an even quantity on the present contract for shipment up to May 1, 1916.

" Of course we will not require you to take out this full quantity, but we will protect you for your full requirements whatever they may be up to 843 bbls., and if you do not take all of the goods we will cancel the same.

" We consider this a fair arrangement, and we hope that it is satisfactory to you."

" The unusual conditions now prevailing " to which the defendant referred, were the conditions growing out of the war. The great difficulty in securing ships by which the molasses could be brought from Porto Rico to New York, the tremendous increase in ocean

rates, a large increase in marine insurance premiums, and the general disorganization which prevailed. Facing a constantly rising market, which of course was but a reflex of the conditions to which we have just referred, the defendant was prompted to write the letter from which we have quoted.

To this letter the plaintiff replied, under date of October eighteenth. The plaintiff said:

" Goods that we have sold so far have been shipped to such trade as we have sold heretofore. * * *

"As a rule at this time of the year we have sent price list out to our trade, we have also advertised molasses to some extent but this year have not done this. * * *

" We wish to state that we only expect to sell to the class of customers we have heretofore sold to and we do not wish to abuse the contract as we wish to continue our pleasant relations which have existed for a number of years, however, as stated in the former part of our letter we do expect to increase our sales over last year, and should have expected to have accomplished this even if the market was normal."

The effect of this letter was to indicate to the defendant that the suggestion of the defendant did not meet the approval of the plaintiff.

Subsequently a representative of the defendant called upon the plaintiff, or upon a representative of the plaintiff, and endeavored to arrange an understanding whereby the defendant would not increase more than fifteen per cent over the amount ordered by the plaintiff from the defendant during the previous year. To this the plaintiff refused to agree.

Their relations continued. In the month of November the plaintiff ordered and received 167 barrels, in December 222 barrels, in January, 1916, 163 barrels, in February 127 barrels, or an aggregate during the period from May 1, 1915, of 972 barrels.

This was in amount practically fifteen per cent more than the plaintiff had ordered in the previous year, and largely in excess of any amount which the plaintiff had ever ordered in any one year.

Their relations then ceased.

During the next three months of the unexpired period covered by the contract, the plaintiff ordered 2,773 barrels. In other words, during the months of February, March and April, 1916, after the alleged breach of the contract, and after defendant had notified the plaintiff that it would make no further deliveries under the contract, the plaintiff ordered from the defendant 2,773 barrels, when for the four years from December, 1911, down to the beginning of the contract in question the total amount purchased by the plaintiff from the defendant, under similar contracts, had been 2,046 barrels.

The defendant had ordered 727 barrels more in the three months mentioned than in the four years preceding this contract.

The plaintiff is and for many years has been an active practitioner, as a veterinary in and about the city of Albany, and in addition to the practicing of such profession he has been a large dealer in veterinary supplies and in supplies for dairymen and stablemen. He has during several years last past issued a large quantity of advertising matter; he has published catalogues by the thousand. He has circularized the trade, he has used trade lists, the telephone directory and other agencies to reach those interested in the purchase of commodities and articles which he was prepared to sell.

All of this business he has conducted upon an absolutely cash basis. That was so with reference to the feed molasses which he sold, having purchased the same from defendant.

He required all orders for molasses to be accompanied by a check. He gave to his customers the advantage of what is known in the trade as a cut rate. This, it may fairly be assumed, in consideration of the transaction being cash before delivery.

The plaintiff had sold not only to consumers but also to dealers. He had sold in small lots and he sold in larger quantities.

The plaintiff's method of doing business was to receive an order accompanied by check in full payment and transmit the order in the form of an addressed card to the agent of the defendant, requesting the defendant to make the shipment direct to the consignee named.

The plaintiff did, from time to time, order small quantities from the defendant to carry the same in stock for orders which might come in.

In the letter of October, 1915, written by the plaintiff to the defendant it is stated that in other years the plaintiff had advertised molasses for sale to some extent but this year that had not been done, and further the plaintiff says that he has obtained this year his business mostly from the dairymen direct and not through the feed dealers.

Before making the contract in question the plaintiff addressed a letter, under date of April 16, 1915, to a molasses dealer at No. 100 Wall street, New York city, acknowledging the receipt of letters from this dealer and saying: " We will shortly be in the market for a year's contract using about 1,000 barrels;" that the plaintiff wanted the goods to be put up in fifty-five gallon barrels, you to make shipments which run from one barrel to twenty as a rule, and asking for a price to be quoted.

While the market price was about twenty cents a gallon in the fall of 1915 in January and February,

1916, the price increased to twenty to twenty-five cents and higher.

The plaintiff's sales manager, Mr. Welch, testified that during the period from February first to May first the plaintiff required all of the molasses which they ordered from the defendant in their regular business.

As shown by the evidence, in February plaintiff's sales manager, Mr. Welch, sent out to the trade generally a postal card addressed to individuals and concerns, which reads as follows:

" February 1st, 1916.  Price of feeding molasses five to seven cents a gallon below market value.  About 1,000 barrels to offer at these prices.  First come first served.  Do not wait; do not hesitate.  Order at once. Milkmore Brand 13½ cents; Devon Brand 12½ cents per gallon f. o. b. New York, cash with order.  If supply is exhausted when order reaches us, we will promptly return remittance."

The plaintiff offered to sell what is known as Milkmore Brand for thirteen and one-half cents per gallon, costing the plaintiff ten cents per gallon in carloads, and costing the plaintiff ten and one-half cents per gallon in less than carload lots, and offering to sell the Devon Brand at twelve and one-half cents per gallon, costing plaintiff nine cents; and this was, as stated by the plaintiff, five to seven cents per gallon below the market value.

The plaintiff's sales manager, Welch, was not positive when testifying as to the market price, and in fact he testified that he could not tell whether he was selling it under the market price or not.  The fact is, that as sales manager for the plaintiff he announced on the postal card sent to his customers, which card was evidently the basis of many of the orders filed with the defendant, which were unfilled by the defendant, that the plaintiff would sell at five to seven cents per gallon

less than the market price, and the fact was that the market price at that time was ranging from twenty to twenty-five cents per gallon.

The plaintiff thus sought to sell for thirteen and one-half cents molasses which he was purchasing under a contract at ten cents, when the market price of the commodity was from twenty to twenty-five cents per gallon.

These postal cards, to which we have referred as having been sent to the trade generally, were sent to wholesale molasses dealers, to distilling companies and merchandise brokers, and one of them reached Louis C. Naisawald & Son, wholesale molasses dealers, to whom the plaintiff wrote the letter above referred to, dated April 16, 1915, to the effect that plaintiff would be in the market for a year's contract and asking Naisawald to quote a price.

In the months of March and April, 1916, these postal cards were also being sent out to the same class of dealers, distilleries, elevator companies, molasses dealers, offering Porto Rico molasses at fourteen cents per gallon and Common Blackstrap at thirteen cents a gallon.

The defendant addressed the letter under date of February 12, 1916, Exhibit 9, to the plaintiff, complaining of the acts of the plaintiff in sending out the postal cards and indicating that it was a drive on the part of the plaintiff and saying that while they were ready to comply with the legitimate and natural demands under their contract that because of the circumstances they now considered the contract at an end and that they would refuse any further orders.

The plaintiff had circularized the trade in previous years, including even dealers in molasses, and he had sold to distilling companies.

Some of these postal cards sent out in the month

of March were not conducive to the act of the defendant in refusing on February 12, 1916, to further comply with the terms of the contract, but they throw light upon the efforts and the motive of the plaintiff in seeking a recovery herein as against the defendant.

Plaintiff was developing gradually his business from year to year in the sale of feed molasses and for a number of years he had sold such goods in an extensive territory. He was gradually calling the attention, by circulars, catalogues and exhibits, of those having requirements for the articles in which he dealt.

In construing this contract it is true that the amount which the plaintiff could order from the defendant was not limited by the amount delivered under a previous contract. It is fair to assume that if intelligently conducted, conditions being reasonably the same, a business would develop and grow.

The authority upon which the plaintiff relies is *New York Central Iron Works Co.* v. *United States Radiator Co.,* 174 N. Y. 331. In that case it was said: " we do not mean to assert that the plaintiff had the right under the contract to order goods to any amount. Both parties in such a contract are bound to carry it out in a reasonable way. The obligation of good faith and fair dealing towards each other is implied in every contract of this character. The plaintiff could not use the contract for the purpose of speculation in a rising market since that would be a plain abuse of the rights conferred and something like a fraud upon the seller. The plaintiff's claim for damages in this case might have been affected by the condition and customs of the trade, and any breach of good faith on its part could be taken into account. In such a case it would be competent for the defendant to plead and prove facts to show that the orders were in excess of the plaintiff's reasonable needs and were not justi-

Supreme Court, February, 1919.    [Vol. 106.

fied by the conditions of the business or the customs of the trade. In other words, that the plaintiff was not acting reasonably or in good faith, but using the contract for a purpose not within the contemplation of the parties; that is to say, for speculative as distinguished from regular and ordinary business purposes.''

In the case from which the quotation has just been made there was the consideration by the court of an open contract as to the quantity of goods which the defendant was to deliver. The defendant filled orders for radiators up to 48,000 feet of radiation. The plaintiff continued to send orders up to 100,000 feet. The orders in excess of 48,000 feet were not filled, the defendant claiming that the contract called for only the usual amount not materially exceeding the quantity delivered in any one year under a similar contract.

The defendant claimed a mutual mistake in framing the contract, and the defendant contended that the plaintiff was limited to the amount of goods delivered under a previous contract. That contention was not sustained.

In reaching a determination in this case we have in mind every detail of the decision in the case just cited.

The contract must be carried out fairly, justly and with reason on the part of each party to it.

In an executory contract, indefinite as to the quantity of goods to be furnished, there is implied good faith and fair dealing on the part of each toward the other, the contract cannot be used for a purpose which was and could not have been within the contemplation of the parties as for speculative purposes as distinguished from the regular and ordinary business which theretofore had been carried on between the parties to the contract. *Wheeler Co.* v. *Mendleson,* 180 App. Div. 9.

In reviewing an order for a bill of particulars in the

case under consideration, Justice Lyon referred to that portion of the opinion above quoted from *New York Central Iron Works Co.* v. *United States Radiator Co.,* and said, referring to the defense here interposed that the contract had been used on the part of the plaintiff for speculative as distinguished from regular and ordinary business purposes, that if such defense is proven it may defeat in whole or in part the alleged cause of action. *Moore* v. *American Molasses Co.,* 179 App. Div. 505.

The plaintiff does not here contend even that he would be justified in using the contract to obtain goods to an unlimited extent for speculative purposes, but his contention is that all the goods ordered after February twelfth and up to May first were actually required by the plaintiff in the ordinary conduct of his business to be sold by the plaintiff through the lines of trade formerly handled by him, and that therefore the defendant, failing to furnish all that was demanded, thus failed to meet the full requirements of the plaintiff, and in justification for such contention makes an earnest argument to show that it was the defendant who was taking advantage of the rising market and thus speculating by the sale of goods to others at a price in excess of the price fixed by the contract, to the plaintiff's damage.

We can determine by an examination of the record, with a degree of accuracy, what goods the plaintiff was entitled to receive from the defendant under the contract, to fairly supply the ordinary and reasonable demands of his business, and when this determination is reached it disposes of every question left in the case.

The defendant had a lawful right to object to supply under the contract an unlimited amount of molasses. The unusual activity of the plaintiff, through his sales manager, Mr. Welch, very properly under the condi-

tions and circumstances awakened the interest of the defendant. An effort was made on the part of the defendant to agree upon a quantity which the defendant stood ready to deliver, and which as a matter of fact it did deliver, which was fifteen per cent in excess of the previous year.

Such an agreement could not be reached, and after that quantity had been delivered the defendant ceased further deliveries.

With a view of an interpretation of this contract as between these parties under the rule fixed by the court, we must inquire whether or not any of the molasses ordered by the plaintiff subsequent to February 12, 1916, was actually required in the business of the plaintiff to meet the reasonable, ordinary and fair demands of the plaintiff, and concerning which under the contract the plaintiff was entitled to a delivery.

If there was molasses thus ordered by the plaintiff, even although it was difficult for the defendant at the time of the demand to recognize the legality of such demand, still at this time, under all of the conditions which have since developed, it seems fair and reasonable that such determination should now be made.

It is particularly desirable that the court should endeavor to determine the equitable relations between these parties, because of the abnormal and disturbing conditions in which at the end of the period covered by the contract the world was involved.

If the full relief asked by plaintiff was here granted he would be very much better off in realizing the damages which under such relief would be granted than he would have been had he received the molasses and sold the same at the price at which he offered to sell.

Comparing the plaintiff's business of the year covered by the contract with previous years, examining the names of those from whom he received orders

which he filed with the defendant, particularly during the months of February, March and April, 1916, taking note of the fact that he was selling to wholesale molasses dealers, competitors of the defendant, that he was selling in carload lots to those with whom he had not theretofore dealt and concerning whose business the sales manager, Mr. Welch, who conducted all of these transactions, was not familiar, having in mind that he was publishing and sending broadcast hundreds of printed notices that he was selling molasses, at a time when there was an extraordinary demand for it from an unexpected source, at six or seven cents less than the market value, all point in the direction of an effort on the part of the plaintiff to use the contract for a purpose certainly not within the contemplation of the parties and for such a purpose as would safely be characterized as speculating in a rising market.

As an evidence that such a condition or demand could not obtain within the contemplation of the plaintiff at least, is the letter from the plaintiff to Naisawald, asking for a price for that year's supply of molasses and stating that his requirements would be about one thousand barrels for the year.

The counsel for the plaintiff upon final submission says: The sole prohibition of the courts in considering the limit beyond which a vendee under such a contract may not go in exceeding the amount of business done under a previous and similar contract, is against any extraordinary endeavor to drive in business, so as to enable the vendee to take an unfair advantage of such an open contract, and the burden rests upon the defendant to show that the plaintiff did something unusual and extraordinary, amounting to what the courts have defined as a " special drive " in order to justify a breach of contract.

It seems from the record that the plaintiff had made a " special drive " and stood ready to sell the goods which came to him from orders through the drive at an extraordinary price.

The plaintiff contends that the evidence shows that there was an extraordinary demand for molasses on the part of farmers owing to the high cost of hay and the relatively low cost of oat straw, which latter product could be fed to stock mixed with molasses, and that such condition existed from the fall of 1915 through the winter of 1916 and caused the unusual demand aforesaid.

That does not explain why the plaintiff stood ready to sell upon demand several hundreds of barrels of molasses to wholesale molasses dealers, elevator companies and others, at six or seven cents a gallon less than its real market value.

What we have written, which is altogether too long, indicates the court's conclusion with reference to the relation between the parties in the executing of the contract.

The defendant made a breach of the contract and is liable therefor.

We may consider in computing the damages the solicitation made by the plaintiff of unusual lines of trade and the items of so-called orders unfilled by the defendant upon which the plaintiff claims a recovery for damage sustained.

The result of such examination leads us to strike out from consideration in awarding damages the following items, namely: March 11, 1916, Hersh Goldberg (second order), 60 barrels; March 22, 1916, Globe Elevator Company, 300 barrels; March 27, 1916, Meader Atlas Company, 600 barrels; April 10, 1916, L. H. Nester, 240 barrels; April 14, 1916, Frank A. Smith Company, 180 barrels; April 25, 1916, Standard

Refining Company, 120 barrels; April 25, 1916, P. Duff & Son, 300 barrels; a total of 1,800 barrels. Eighteen hundred barrels at 55 gallons each barrel, equals 99,000 gallons. Damages at ten cents each gallon, equals $9,900. Amount claimed by plaintiff as damages, $15,251, from which there is to be deducted $9,900, leaving the damages awarded in favor of plaintiff against the defendant, $5,351.

Findings may be made in accordance herewith and judgment upon such findings may be entered in favor of the plaintiff as against the defendant for $5,351, with interest and costs.

Judgment accordingly.