821 So.2d 197 (2001)
SIMCALA, INC.
v.
AMERICAN COAL TRADE, INC.
1000739.
Supreme Court of Alabama.
November 9, 2001.
*199 James M. Sizemore, Jr., Montgomery; and James C. Grant and Owen T. Hill of Alston & Bird, L.L.P., Atlanta, Georgia "of counsel," for appellant.
Michael D. Ermert and Bruce J. McKee of Hare, Wynn, Newell & Newton, Birmingham, for appellee.
LYONS, Justice.
American Coal Trade, Inc. ("ACT"), commenced an action against Simcala, Inc., alleging a breach of contract arising from Simcala's failure to perform its agreement to purchase its estimated coal requirements from ACT. Following a bench trial, the trial court entered a final judgment in favor of ACT and against Simcala in the amount of $101,850 in lost profits and $10,690 in interest, plus costs.
We affirm.

I. Facts and Background

Simcala, the buyer, issued a purchase order dated January 12, 1998, pursuant to which it estimated it would purchase, during 1998, from ACT 17,500 tons of "Black Creek" coal at $78.50 per ton. The purchase order stated that the order was a blanket order for 1998 and that "the above [i.e. 17,500 tons] is an approximate quantity and to be shipped as required." Simcala also included in the purchase order chemical and size specifications for the coal.
During 1998 Simcala actually purchased only 7,200 tons of coal from ACT, representing 41% of the estimated amount. Simcala ordered approximately 6,000 tons of coal from ACT between January and mid-May. Simcala suspended its orders in mid-May because of problems with its furnace and it purchased no coal from ACT from mid-May to the end of June. Simcala claims that the furnace problems were caused by the poor quality of the ACT coal, but it does not argue that the coal failed to meet the specifications in the purchase order. Simcala resumed orders for coal at the end of June and purchased approximately 1,200 tons during July and August.
The mine from which ACT obtained its coal to fulfill the Simcala purchase order closed in August 1998. However, throughout September, ACT's supplier had a surplus of coal from that mine and ACT had asked Simcala to purchase some of this surplus coal. Simcala, however, ordered no coal in September.
In early October Simcala ordered 600 tons of coal from ACT. However, ACT did not deliver the coal because by October its supplier had sold the surplus coal from the closed mine to another buyer. ACT offered uncontroverted evidence that by mid-October it would have had another source had Simcala ordered any additional coal, but Simcala did not order any additional coal from ACT.
The trial court found no evidence that Simcala's reduction in the amount of coal it ordered and the eventual cessation of its orders were in bad faith. However, the court found that Simcala's purchase of only 41% of its estimated needs for the year was "unreasonably disproportionate" under § 7-2-306(1), Ala.Code 1975, and it held, therefore, that Simcala had breached the contract. The trial court also found that ACT's profit would have been $10.50 for each ton of coal had Simcala purchased the full amount estimated. Thus, the court, as previously noted, awarded ACT lost profits of $101,850, and interest in the *200 amount of $10,690, and taxed costs to Simcala.[1]
Section 7-2-306(1), part of Alabama's version of the Uniform Commercial Code, states:
"A term which measures the quantity by the output of the seller or the requirements of the buyer means such actual output or requirements as may occur in good faith, except that no quantity unreasonably disproportionate to any stated estimate or in the absence of any stated estimate to any normal or otherwise comparable prior output or requirements may be tendered or demanded."

(Emphasis added).
Simcala argues that the "unreasonably disproportionate" language contained in § 7-2-306(1) applies only to amounts exceeding the estimates in requirements contracts, not to lesser amounts than the estimates. Thus, Simcala claims it was entitled to reduce its requirementseven to zeroso long as it did not do so in bad faith; it further claims that the trial court correctly found it was not acting in bad faith when it reduced its purchases below the estimate in the purchase order. In the alternative, Simcala argues that even if the "unreasonably disproportionate" language applies to decreases from estimates, its performance was excused because, it says, ACT breached the contract when it was unable to meet Simcala's order for 600 tons of coal in early October.
The question presented is one of first impression in Alabama: Whether § 7-2-306(1), Ala.Code 1975, permits a buyer purchasing pursuant to a requirements contract to reduce its requirements to a level unreasonably disproportionate to an agreed-upon estimate so long as it is acting in good faith. The trial court interpreted § 7-2-306(1) to mean that a requirements-contract buyer who has provided the seller an estimate of its requirements may not reduce its requirements to a level unreasonably disproportionate to that estimate, even when it does so in good faith. The trial court concluded that the reduction in this case was unreasonable. The trial court's interpretation of § 7-2-306(1) involves a question of law; it is reviewed de novo by an appellate court, without any presumption of correctness. Aetna Cas. & Sur. Co. v. Mitchell Bros., Inc., 814 So.2d 191, 195 (Ala.2001); Reed v. Board of Trustees for Alabama State Univ., 778 So.2d 791, 793 n. 2 (Ala.2000); Donnelly v. Doak, 346 So.2d 414, 416 (Ala.1977).

II. Application of § 7-2-306(1)

"Words used in a statute must be given their natural, plain, ordinary, and commonly understood meaning, and where plain language is used a court is bound to interpret that language to mean exactly what it says." IMED Corp. v. Systems Eng'g Assocs. Corp., 602 So.2d 344, 346 (Ala.1992), quoted in Ex parte Fann, 810 So.2d 631, 633 (Ala.2001). Our primary obligation is to "ascertain and give effect to the intent of the Legislature as that intent is expressed through the language of the statute." Ex parte Krothapalli, 762 So.2d 836, 838 (Ala.2000). Moreover, we must presume "`that every word, sentence, or provision was intended for some useful purpose, has some force and effect, and that some effect is to be given to each, and also that no superfluous words or provisions were used.'" Ex parte Children's Hosp. of Alabama, 721 So.2d 184 (Ala. 1998), quoting Sheffield v. State, 708 So.2d *201 899, 909 (Ala.Crim.App.1997). See also Elder v. State, 162 Ala. 41, 45, 50 So. 370, 371 (Ala.1909) (stating that it is unreasonable to presume that the Legislature intended the words it used to be meaningless).
Because this case presents a question of first impression concerning language used in the Uniform Commercial Code, "we look for guidance to the Uniform Commercial Code itself, the official Comments to the Code, the writings of commentators, and the case law of other jurisdictions." Massey Ferguson Credit Corp. v. Wells Motor Co., 374 So.2d 319, 321 (Ala.1979). Comment 3[2] of the official comments to § 7-2-306 states:
"If an estimate of output or requirements is included in the agreement, no quantity unreasonably disproportionate to it may be tendered or demanded. Any minimum or maximum set by the agreement shows a clear limit on the intended elasticity. In similar fashion, the agreed estimate is to be regarded as a center around which the parties intend the variation to occur."

(Emphasis added.) The use of the word "center" clearly indicates that the drafters intended to prohibit both unreasonably disproportionate increases and decreases from the estimates in a requirements contract. To interpret § 7-2-306(1) to prohibit only unreasonably disproportionate increases, but not decreases, would make the description in official comment 3 of an estimate as a "center around which the parties intend the variation to occur" mere surplus verbiage.
Simcala emphasizes official comment 2 in support of its argument that § 7-2-306(1) prohibits only unreasonably disproportionate increases. Comment 2 states:
"Reasonable elasticity in the requirements is expressly envisaged by this section and good faith variations from prior requirements are permitted even when the variation may be such as to result in discontinuance. A shut-down by a requirements buyer for lack of orders might be permissible when a shut-down merely to curtail losses would not. The essential test is whether the party is acting in good faith."

(Emphasis in Simcala's brief.) While comment 3 begins with the words, "If an estimate... is included ...," comment 2 does not mention estimates. Comment 2 addresses the general limitation of "good faith," which applies when there is no agreed-upon estimate. See Orange & Rockland Utils., Inc. v. Amerada Hess Corp., 59 A.D.2d 110, 115, 397 N.Y.S.2d 814, 818-19 (1977). The specificity of comment 3, however, dealing with estimates, displaces the generality of comment 2. Comment 3 therefore applies in the special case, like this one, where the parties have agreed on an estimate. Thus, the drafters' comments to § 7-2-306 support the conclusion that the statute applies both to unreasonably disproportionate increases and decreases from agreed-upon estimates.
Some federal courts and other state courts have previously addressed this question. Brewster of Lynchburg, Inc. v. Dial Corp., 33 F.3d 355, 365 (4th Cir.1994) (predicting direction of Arizona law); Atlantic Track & Turnout Co. v. Perini Corp., 989 F.2d 541, 544-45 (1st Cir.1993) (predicting direction of Massachusetts law *202 on an output contract); Empire Gas Corp. v. American Bakeries Co., 840 F.2d 1333, 1335 (7th Cir.1988) (predicting direction of Illinois law); R.A. Weaver & Associates, Inc. v. Asphalt Constr., Inc., 587 F.2d 1315, 1321-22 (D.C.Cir.1978) (predicting direction of District of Columbia law); Canusa Corp. v. A & R Lobosco, Inc., 986 F.Supp. 723, 729 (E.D.N.Y.1997) (predicting direction of New York law as to an output contract); Indiana-American Water Co. v. Town of Seelyville, 698 N.E.2d 1255, 1260 (Ind.App.1998); Romine, Inc. v. Savannah Steel Co., 117 Ga.App. 353, 354, 160 S.E.2d 659, 660-61 (1968). Most of these courts have resolved this issue in favor of the party in Simcala's position, holding that unreasonably disproportionate decreases are permissible so long as the buyer has acted in good faith, but that unreasonably disproportionate increases are impermissible. However, in Romine v. Savannah Steel Co., 117 Ga.App. at 354-55, 160 S.E.2d at 661, the Georgia Court of Appeals interpreted the statute to apply to deviations both above and below the stated estimate. Of course, while these decisions from other jurisdictions may be persuasive, this Court is not bound by federal or other state court decisions construing the laws of other states, even though the law being construed may be identical to Alabama law. Weems v. Jefferson-Pilot Life Ins., Co., 663 So.2d 905, 913 (Ala.1995); Fox v. Hunt, 619 So.2d 1364, 1367 (Ala. 1993).
Several courts that have reached the opposite conclusion have candidly acknowledged that by its plain meaning, the statute prohibits unreasonably disproportionate decreases from estimates. Brewster, 33 F.3d at 364 ("Although this statute may appear to prescribe both unreasonably disproportionate increases and reductions in a buyer's requirements, judicial interpretations of this statute provide otherwise."), Empire Gas, 840 F.2d at 1337 ("The proviso does not distinguish between the buyer who demands more than the stated estimate and the buyer who demands less, and therefore if read literally it would forbid a buyer to take (much) less than the stated estimate."), R.A. Weaver & Assocs., 587 F.2d at 1322 ("The limiting language of Section 2-306(1) accordingly would seem to preclude appellant's reducing its requirements to zero, for zero would appear the quintessential `disproportionate amount.'").
Courts interpreting analogous provisions of § 7-2-306(1) to allow unreasonably disproportionate decreases from stated estimates if those decreases are in good faith emphasize concerns over market impact that would flow from following the plain meaning of the statute. See, e.g., Atlantic Track & Turnout Co., 989 F.2d at 545 ("an obligation to buy approximately a stated estimate of goods would pose a significant burden on buyers as it would force them to make inefficient business judgments"); Empire Gas, 840 F.2d at 1338 ("If the obligation were not just to refrain from buying a competitor's goods but to buy approximately the stated estimate ... the contract would be altogether more burdensome to the buyer.").
While other courts may be willing to look beyond the language chosen by their legislatures, we have repeatedly reaffirmed the fundamental principle of statutory construction that, where possible, words must be given their plain meaning. See, e.g., Ex parte Smallwood, 511 So.2d 537, 539 (Ala.2001); Ex parte Krothapalli, 762 So.2d at 838; IMED Corp., 602 So.2d at 346. The plain language of § 7-2-306(1) admits of only one interpretation that both unreasonably disproportionate increases and reductions in estimates are forbidden. See Brewster, 33 F.3d at 364; Empire Gas, 840 F.2d at 1337.
*203 As we have repeatedly stated, the function of this Court is "`to say what the law is, not what it should be.'" Ex parte Achenbach, 783 So.2d 4, 7 (Ala.2000), quoting DeKalb County LP Gas Co. v. Suburban Gas, Inc., 729 So.2d 270, 276 (Ala. 1998). To hold as Simcala requests we dothat the statute forbids only unreasonably disproportionate increases but not decreaseswould require us to presume that the Legislature did not intend the ordinary meaning of the words that it chose to use in its enactment. We conclude that the interpretation supported by the plain meaning of the language of the statute and by the official comments is that § 7-2-306(1) prohibits unreasonably disproportionate decreases made in good faith. If adverse effects on market conditions warrant a different result, it is for the Legislature, not this Court, to amend the statute.
The trial court found no evidence that Simcala had acted in bad faith in reducing its requirements, but it found that Simcala had breached the contract because its actual purchases of coal7,200 tonswere unreasonably disproportionate to its stated estimate17,500 tons. Simcala does not challenge the finding that its actual purchases from ACT were unreasonably disproportionate to the estimate. Under our construction of § 7-2-306(1), even assuming Simcala's good faith, Simcala breached its requirements contract with ACT by demanding an unreasonably disproportionate reduction from its stated estimate. Thus, further discussion of the trial court's finding that Simcala had acted in good faith is unnecessary.

III. Effect of ACT's Alleged Prior Breach

Finally, Simcala argues that even if it was prohibited from reducing its requirements to 41% of its stated estimate, ACT is estopped to assert Simcala's breach because, Simcala argues, ACT breached the contract first when it lost its coal supplier in late August and was unable to deliver Simcala's shipment in early October. Thus, says Simcala, ACT's breach relieved Simcala of any further obligations under the contract and allowed it to suspend performance.
We first note that the contract is silent concerning what suppliers ACT could use to meet Simcala's orders. ACT offered uncontradicted testimony that from mid-October through the end of the year, it would have been able to supply Simcala with coal had Simcala requested it.
Section 7-2-610, also part of Alabama's version of the Uniform Commercial Code, states, in relevant part:
"When either party repudiates a contract with respect to a performance not yet due the loss of which will substantially impair the value of the contract to the other, the aggrieved party may ... suspend his own performance."
(Emphasis added.) Thus, only anticipatory repudiations that "substantially [impair] the value of the contract" to the aggrieved party will give the aggrieved party the right to suspend its own performance. Official comment 2 to § 7-2-610; 2A Ronald A. Anderson, Anderson on the Uniform Commercial Code §§ 2-610:8 and 2-610:76; James J. White & Robert S. Summers, Uniform Commercial Code 173 (4th ed.1995).
Whether a partial repudiation of a contract substantially impairs the value of the contract to the nonrepudiating party is a question of fact. Anderson on the UCC § 2-610:15. It is a well-established principle that "[w]hen a trial court does not make specific findings of fact concerning a particular issue, an appellate court will assume that the trial court made those findings that would have been necessary *204 to support its judgment, unless these findings would be clearly erroneous." Ex parte Byars, 794 So.2d 345, 349 (Ala.2001); Lemon v. Golf Terrace Owners Assoc., 611 So.2d 263, 265 (Ala.1992). In this case the trial court made no specific finding as to whether ACT's failure to deliver the 600 tons of coal in October substantially impaired the value of the requirements contract with Simcala, which contained an estimate of 17,500 tons. Simcala offered no evidence of any detriment it suffered as a result of ACT's failure to deliver the order. After reviewing the record, we conclude that ACT's failure to deliver the requested 600-ton shipment in October did not substantially impair the value of the contract, and a finding to that effect by the trial court would not have been clearly erroneous.
That Simcala could not show a "substantial impairment" does not mean it was without legal recourse when it discovered that ACT's usual supplier for "Black Creek" coal had ceased operations and ACT failed to supply Simcala's October order. Section 7-2-609, Ala.Code 1975, states, in relevant part:
"(1) A contract for sale imposes an obligation on each party that the other's expectation of receiving due performance will not be impaired. When reasonable grounds for insecurity arise with respect to the performance of either party the other may in writing demand adequate assurance of due performance and until he receives such assurance may if commercially reasonable suspend any performance for which he has not already received the agreed return."
(Emphasis added.) When Simcala learned that ACT had lost its supplier and was unable to deliver the October order, it could have made a written demand for adequate assurance of performance pursuant to § 7-2-609, Ala.Code 1975. Simcala made no such request. The uncontroverted evidence establishes ACT's ability to perform after its failure to deliver the 600 tons of coal ordered in October, perhaps explaining Simcala's failure to make such requests.

IV. Conclusion

Simcala was obligated under § 7-2-306(1) to purchase an amount not unreasonably disproportionate to its stated estimate of 17,500 tons. ACT did not breach the contract. Thus, Simcala remained obligated under the contract.
The judgment of the trial court is affirmed.
AFFIRMED.
MOORE, C.J., and HOUSTON, SEE, BROWN, JOHNSTONE, and HARWOOD, JJ., concur.
WOODALL and STUART, JJ., dissent.
WOODALL, Justice (dissenting).
The majority has employed the plain-meaning rule of statutory construction so as to defeat the obvious purpose of § 7-2-306(1), Ala.Code 1975. In doing so, it has ignored another fundamental rule of statutory construction:
"A literal interpretation of a statute will not be blindly adopted when it would defeat the purpose of the statute, if any other reasonable construction can be given to the language in dispute. Burton Manufacturing Co. v. State, 469 So.2d 620 (Ala.Civ.App.1985)."
McClain v. Birmingham Coca-Cola Bottling Co., 578 So.2d 1299, 1301 (Ala.1991).
One obvious purpose of § 7-2-306(1) is to treat a requirements contract differently than a contract to purchase a specific quantity of goods. However, under the majority's interpretation of that section, *205 Simcala is required to pay to ACT the latter's anticipated profits on the entire quantity of coal, which the purchase order clearly indicated was only "an approximate quantity and to be shipped as required." Not only is that holding inconsistent with the purpose of the statute, it is also inconsistent with the majority's own conclusion that Simcala's purchase of some lesser amount "not unreasonably disproportionate to its stated estimate" would not be actionable.
It is presumptuous for the majority to conclude that "[t]he plain language of § 7-2-306(1) admits of only one interpretationthat both unreasonably disproportionate increases and reductions in estimates are forbidden." In fact, there is another reasonable construction that can be given to the language in dispute, one that would be more consistent with the obvious purpose of the statute. Indeed, as the majority points out, most of the federal and state courts that have addressed the relevant question "have resolved this issue in favor of the party in Simcala's position, holding that unreasonably disproportionate decreases are permissible so long as the buyer has acted in good faith, but that unreasonably disproportionate increases are impermissible." I would adopt this more reasonable construction, and would hold that the trial court's finding that Simcala acted in good faith in ordering the coal it required precludes any recovery by ACT. Therefore, I respectfully dissent.
STUART, J., concurs.
NOTES
[1] The trial court based its calculation of damages on the difference between the 7,800 tons of coal Simcala purchased or orderedincluding 600 tons ACT did not deliverand Simcala's estimated requirements17,500 tons.
[2] We note that the "official comments" to the Uniform Commercial Code included in the Alabama Code were not formally adopted by the Alabama Legislature in the 1975 recodification. They were printed in the Code with the permission of the American Law Institute. However, the Legislature was aware of these explanatory comments indicating the drafters' intent upon recodification of the Code in 1975.