[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 12-12186
Non-Argument Calendar
_____

D.C. Docket No. 7:10-cv-02095-LSC


GLOBAL MINERALS CORPORATION,

Plaintiff-Appellant,

versus

NUCOR STEEL TUSCALOOSA, INC.,
NUCOR CORPORATION,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Alabama
_____

(September 20, 2012)

Before CARNES, WILSON and KRAVITCH, Circuit Judges.

PER CURIAM:

Global Minerals Corporation (Global) appeals from the district court's grant

of summary judgment in favor of defendants Nucor Steel Tuscaloosa, Inc. (NSTI) and Nucor Corporation (NC) in this breach-of-contract action.[1]  Because we agree with the district court that there was no breach, we affirm.

## I.

NC is the largest steel producer in the United States and owns NSTI, which is engaged in the production of steel using raw minerals such as ferrosilicon.  In February 2008, NSTI purchasing supervisor James Yerkes requested from several entities a price quote for ferrosilicon.  Although Global's quote was not the lowest, NSTI agreed to a trial order from Global to qualify Global for future purchases.  In March 2008, NSTI and Global entered into a deal for 100 net tons of ferrosilicon to be delivered from October through December of that year.  The purchase order (PO) explained: "NSTI makes no commitment or guarantee with regard to the actual quantity of product released under this purchase order.  However, shall not exceed 100 net tons without agreement with Global Minerals."  There is no dispute that both parties fulfilled their obligations under this contract.

During the spring of 2008, the price of ferrosilicon rose rapidly.  To ensure that it had sufficient supply, NSTI issued another PO on June 3, 2008 (the June PO), before the trial delivery period even began but subject to satisfactory

---

[1]  We have diversity jurisdiction over this dispute.  28 U.S.C. § 1332.

performance of the trial order.  In the June PO, NSTI ordered 600 net tons of ferrosilicon to be delivered between September and December 2008 at the price of $1.48 per pound.  This quantity was changed to 600 metric tons at Global's request.  The June PO contained the same "no commitment of guarantee with regard to the actual quantity of product released under this purchase order" language, as well as the "not to exceed" language.

Thereafter, the demand for, and price of, ferrosilicon dropped.  Yerkes approached Global to renegotiate the price, but Global declined to do so.  From September through December 2008, NSTI took delivery of only 29.79 tons from the June PO.  On December 29, 2008, Yerkes sent an email to Global's vice president of sales, Dan Ritter, informing Ritter that NSTI would not be taking any more ferrosilicon under the June PO.  Yerkes advised Ritter that NSTI needed much less ferrosilicon than anticipated due to business conditions and the recession.

By email, Ritter responded that the June PO was a contract for a set quantity of ferrosilicon, and he requested that NSTI purchase the remaining tons under the terms of the contract.  In a follow-up email, Ritter wrote that NSTI was obligated to purchase an amount "reasonably proportionate" to the quantity given in the contract, which it had not done.

3

Although Yerkes believed NSTI had fulfilled its obligations under the June PO, on January 9, 2009, Yerkes contacted Ritter with the following offer: NSTI would extend the contract through the first half of 2009 and would take all of its purchase requirements from Global during that time.[2]  Yerkes explained that there was no volume guarantee, and it offered to pay low market price plus $.39 per pound.[3]  Ritter responded with two offers, each proposing that NSTI purchase the remaining amount of the original 600 tons by the first half of 2009, with an additional purchase at an agreed-upon price.  By email, Yerkes informed Ritter that the counter-offers were unacceptable and that NSTI's offer was non-negotiable.  Ritter responded that he was not happy to take the loss but would accept the offer in the hope that NSTI and Global could continue to work together.

After Ritter accepted NSTI's terms, Yerkes issued a change order on January 15, 2009 (the January PO).  This document was identical to the June PO and had the same order number, but the words "change order" were stamped diagonally across each page, the description specified "ADDENDUM 1/15/2009," and the due date was marked as June 30, 2009.  The January PO stated:

---

[2] NSTI had contracted with another company for its ferrosilicon for the first half of 2009 but deferred the deal until the second half of the year to accommodate the deal with Global.

[3] For purposes of this deal, the market price was set by Ryan's Notes, an industry publication.

4

This change order is issued to extend the end date of this blanket order until June 30, 2009, based on a sincere request from Global Minerals to do so. Given the economic situation and that Nucor will help our supplier base, at time, this order is extended. NSTI continues to make no commitment or guarantee with regard to the actual quantity of product released under this purchase order. However, NSTI will take all of its purchase requirements during this period January through July 2009 from Global Minerals. The price shall be changed to a formula basis, as Ryan's Notes Low for the month prior to the month of shipment plus $.39 per pound. . . . A price cap of $1.48 per pound . . . shall also be in effect. This change is confirmed with Dan Ritter on January 13, 2009 and per email proposal from Jim Yerkes to Dan Ritter dated January 9, 2009. By Jim Yerkes -January 15, 2009.

After seeing the January PO, Ritter emailed Yerkes, "it looks like what we discussed on the phone and email so lets get it going."

NSTI purchased only about 120 tons under the January PO. NSTI did not purchase ferrosilicon from any other distributor, but it did take delivery of some of its own stored inventory that had been purchased earlier from entities other than Global.

In November 2009, Global's president Michael Xu contacted Yerkes to request that NSTI extend the January PO to 2010 to purchase the remaining 400 tons of ferrosilicon Global was warehousing. After NSTI declined, Global filed the instant breach-of-contract action naming as defendants NSTI and its parent

5

company, NC.[4]

Both parties moved for summary judgment.  Global argued that each PO was a separate contract and that the January PO could not be a modification to the June PO because it was entered into after the time to perform under the June PO had passed.  Global also argued that NC was liable under agency theory.  NSTI argued that there was no breach because the January PO was an accord and satisfaction and a substitute agreement.  NSTI also noted that the January PO was a requirements contract with no volume guarantee, and NSTI had adhered to the terms by purchasing only from Global during the relevant time period.  Finally, NC argued that it was not liable because there was no agency relationship, it had no role in the contracts, and there was no basis to pierce the corporate veil.

The district court granted NSTI's summary judgment motion, finding no breach of contract.  Specifically, the court found that there was only one contract – the June PO – and the January PO was a change order to that contract.  In reaching this conclusion, the court considered the emails between Yerkes and Ritter leading up to the January PO, but the court explained that it would reach the same result

_____

[4] Global filed its original complaint in the Southern District of New York, alleging breach of contract, misrepresentation, breach of implied contract, and breach of the covenant of good faith and fair dealing.  The case was transferred to the Northern District of Alabama and the district court granted NSTI's motion to dismiss the claims of breach of implied-in-fact contract and breach of the covenant of good faith and fair dealing.  Global then filed an amended complaint raising only a breach-of-contract claim and the claim against NC.

even if confined to the "four corners" of the January PO. The court then found that the January PO created a requirements contract, which contained neither an estimate nor a specific quantity, but only a maximum purchase amount of 600 tons.[5] The court concluded that NSTI had fulfilled its obligations under the contract by taking all of its purchase requirements from Global, and there was no evidence NSTI acted in bad faith. This is Global's appeal.

## II.

We review *de novo* the district court's grant of summary judgment. *Robinson v. Tyson Foods, Inc.*, 595 F.3d 1269, 1273 (11th Cir. 2010). A district court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "We draw all factual inferences in a light most favorable to the non-moving party." *Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008).

In a diversity action such as this, we apply the substantive law of the forum state, here Alabama, along with federal procedural law. *Horowitch v. Diamond Aircraft Industrs., Inc.*, 645 F.3d 1254, 1257 (11th Cir. 2011). Alabama has

---

[5] Because the court found that there was no breach, it did not consider the claims against NC. Global does not make any argument related to NC in its appellate brief and thus has waived any claims. *Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1330 (11th Cir. 2004).

7

codified the Uniform Commercial Code governing the sale of goods. *See, e.g. La Trace v. Webster*, 17 So.3d 1210, 1216 (Ala. Civ. App. 2008); *see also* Ala. Code § 7-2-102.

Global argues that it entered into two separate and independent contracts, one in June 2008 and another in January 2009, and that the district court erred by concluding that the January PO was a substitution of the June PO. Global further argues that the district court erred by considering the emails between Yerkes and Ritter, and by finding that the 600 tons was a maximum amount rather than an estimate. Global agrees that the January PO was a requirements contract, but explains that NSTI breached it by taking a disproportionate reduction from its estimated purchase or by acting in bad faith.

III.

A. The January PO

We begin by determining whether the January PO constituted an independent contract or simply a substitution for the June PO. In answering this question, we consider whether the district court was limited to the four corners of the PO or if it was permitted to consider extrinsic, or parol, evidence.

To establish that the January PO is a substituted contract, we look at four elements: "(1) a previous valid obligation; (2) an agreement of the parties thereto

8

to a new contract or obligation; (3) an agreement that it is an extinguishment of the old contract or obligation; and (4) the new contract or obligation must be a valid one between the parties thereto." *Cook's Pest Control, Inc. v. Rebar*, 28 So.3d 716, 728 (Ala. 2009) (internal citations and quotation marks omitted) (discussing the elements of a novation); *see also Safeco Ins. Co of Amer. v. Graybar Elec. Co., Inc.*, 59 So.3d 649, 656 (Ala. 2010). (explaining that a novation and a substitute contract are the same except a novation requires different parties). A "substituted contract is one that is accepted in satisfaction of the original contract and thereby discharges it." *Safeco Ins. Co of Amer.*, 59 So.3d at 656. "[W]hether there has been a substituted contract depends upon the intention of the parties, which may be determined by the facts and circumstances." *Id.* at 657; *see also Barnett v. Quinn*, 979 So.2d 816, 820 (Ala. Civ. App. 2007) (discussing requirements of a valid accord and satisfaction).

Whether a court may consider parol evidence to interpret the meaning of a document depends on whether the document is ambiguous; if it is, parol evidence is admissible. *Vulcan Painters, Inc. v. MCI Constructors, Inc.*, 41 F.3d 1457, 1461 (11th Cir. 1995). In contrast to the limitations on extrinsic evidence, documents that are incorporated by reference in the contract are admissible. *Ex parte Dan Tucker Auto Sales, Inc.*, 718 So.2d 33, 36 (Ala. 1998); *see also*

9

*Cavalier Mfg., Inc. v. Clarke*, 862 So.2d 634, 640 (Ala. 2003) ("[A] contract may incorporate the terms of another document by reference." (internal citation and quotation marks omitted)).

Global contends that the district court erred by considering the emails between Yerkes and Ritter. We disagree. The January PO specifically refers to Global's request to extend the June PO and to the emails between the two companies. Thus, the emails are incorporated by reference and are not parol evidence. *Id.* The district court was therefore permitted to consider these emails when determining whether the January PO constituted an independent contract.

The emails detail the negotiations between Global and NSTI after Yerkes notified Ritter that NSTI would take no further deliveries of ferrosilicon. Ritter expressed concern over taking a loss, but agreed to Yerkes's offer to extend the purchases through the first half of 2009. The emails establish a series of offers, counter-offers, and acceptance of the January PO to off-set Global's losses. Thus, the emails establish all the elements of a substitute contract. *See Cook's Pest Control*, 28 So.3d at 728.

The January PO itself confirms this conclusion. The PO has the words "change order" stamped diagonally across the pages. It uses the same purchase order number as the June PO, and the description indicates that it is an addendum.

10

The text further states that it is an extension of the previous order, with the due date changed to reflect the extension. And the above-market price is listed in the text. Considering all of this evidence, there is no genuine issue of material fact that the January PO was a substitution contract.

B. Breach

The next question before us is whether the district court properly concluded that there was no breach of the substituted contract. The parties agree that the January PO was a requirements contract.

In a requirements contract, if an estimate of quantity is given, the buyer may deviate from the stated quantity but must not take an amount "unreasonably disproportionate" to the estimate. Ala. Code § 7-2-306 & cmt.3. In the absence of an estimate, a breach can occur if the buyer did not act in good faith. *See Simcala, Inc. v. Amer. Coal Trade, Inc.*, 821 So.2d 197, 201 (Ala. 2001). Good faith allows a buyer to deviate based on lack of orders but not merely because the buyer wishes to curtail losses. Ala. Code § 7-2-306, cmt.2.

Courts should construe contracts "so as to give meaning to all provisions whenever possible." *Bd. of Water & Sewer Comm'rs of City of Mobile v. Bill Harbert Constr. Co.*, 870 So.2d 699, 710 (Ala. 2003). "When interpreting a contract, a court should give the terms of the agreement their clear and plain

11

meaning and should presume that the parties intended what the terms of the agreement clearly state." *Ex parte Dan Tucker Auto Sales*, 718 So.2d at 36. "Words used in a contract will be given their ordinary, plain, or natural meaning where nothing appears to show they were used in a different sense or that they have a technical meaning." *Id.*

Here, the January PO did not include an amount as an estimate of NSTI's needs. The January PO specifically stated that there was no commitment or guarantee as to the actual quantity except that it would not exceed 600 [metric] tons. Giving terms their ordinary meaning, the language "not to exceed" would ordinarily indicate an upper limit rather than an estimate. *Cf. Simcala*, 821 So.2d at 198 (stating that the language "the above [i.e. 17,500 tons] is an approximate quantity" was an estimate and concluding that the buyer's purchase of 7,200 toms was unreasonably disproportionate).

Because the January PO's listed quantity was a maximum and not an estimate, NSTI was not in breach for taking less than 600 tons so long as it acted in good faith. Even construing the facts in the light most favorable to Global, Global has not shown that NSTI acted in bad faith. NSTI did not purchase ferrosilicon from any other company during the relevant time period. NSTI's decision to use some of its own stored inventory, which was consistent with the

12

plain language of the contract, cannot amount to bad faith.   Global has therefore failed to establish a genuine issue of material fact about whether NSTI breached the January PO.

For the foregoing reasons, we affirm the order granting summary judgment in favor of NSTI and NC.

**AFFIRMED.**