PER CURIAM.
 

 On August 30, 2001, Robert Rebar and his wife Margo Rebar sued Cook’s Pest Control, Inc., James Aycock, Dannie McClusky, and Harold Pinckard.
 
 [1]
 
 The complaint alleged fraudulent misrepresentation, fraudulent suppression, negligence, negligence per se, breach of contract,
 
 *719
 
 negligent misrepresentation, unjust enrichment, failure to warn, and negligent training, supervision, and retention of employees.
 
 [2]
 
 The complaint was later amended to add a bad-faith claim, but that claim was ultimately withdrawn. All the claims were based upon Cook’s alleged failure to treat and control a termite infestation in a house purchased by the Rebars and to repair the damage to the house caused by the termites.
 

 Facts and Procedural History
 

 In March 2000, the Rebars entered into a contract to purchase a house from Richard Duell and Marsha Duell. The Duells built the house in 1987, and it suffered from a defect that made it susceptible to termite infestation. Specifically, the front wall of the house was built below grade, which resulted in some of the wood siding being in contact with the ground. The house was protected by a termite-control contract issued by Cook’s to the Duells when the house was built. This contract was a “re-treatment-only” contract, which provided that Cook’s would inspect the property for termites annually and would re-treat the property if termites were found. In 1998, termites were found at the property, and Cook’s re-treated the areas of infestation. The evidence presented at trial suggested that, when it retreated the property, Cook’s learned about the defect that made the house more susceptible to infestation. Cook’s advised the Duells to fix the defect.
 

 The purchase contract between the Duells and the Rebars stated that “the [Rebars] require[ ] additional inspection of the property at [the Rebars’] expense.” The purchase contract further stated that “if such inspections reveal conditions unsatisfactory to [the Rebars], [the Rebars] may, at [the Rebars’] option, (a) terminate the contract or (b) request that [the Duells] correct the unsatisfactory condition(s).” The contract provided that the Rebars must exercise the option “by written notice to [the Duells] delivered to [the Duells] on or before 5:00 PM on March 30, 2000.” Separately, the purchase contract stated that “[the Rebars] require a wood infestation report,” but the contract was silent as to what would occur if the wood-infestation report revealed any unsatisfactory conditions.
 

 After contracting to purchase the house, the Rebars hired Hank Belcher, a structural engineer who worked for a home-inspection company, to inspect the property. On March 27, 2000, Belcher issued a report that stated that the property was in good condition. Belcher also prepared a “punch list” of minor or cosmetic items that needed to be repaired. The Duells agreed to repair the items on the punch list.
 

 Pursuant to the purchase contract, Cook’s inspected the property and prepared the required wood-infestation inspection report (“WIIR”). The WIIR indicated that the inspection did not find an active termite infestation but noted that a previous infestation was reported in the Duells’ file. Cook’s inspector, Dennis Duggan, later added to the WIIR a signed, handwritten note, which indicated that the previous termite damage had been repaired by the Duells. Specifically, the note stated:
 

 “Previous Termite Damage
 

 “ — Front windows above sub-floor of basement Damage repaired by customer 1999
 

 
 *720
 
 “ — Siding ground contact — termite damage See graph — customer cut siding 1999.”
 

 Although, the WIIR contained disclaimers that it is not intended to be a report of damage, the WIIR emphasized that “evidence of infestation may be synonymous with damage.” The WIIR was prepared after the March 30, 2000, inspection deadline, and it was not presented to the Re-bars until the closing on April 21, 2000.
 
 [3]
 

 Mr. Rebar testified that, in deciding to close on the purchase of the house, he relied upon the representation that Cook’s had properly treated the house for termites since the house was constructed and upon the representations in the WIIR that all termite damage had been repaired. Upon seeing the WIIR at the closing, Mr. Rebar expressed concerns over the contents of the document. However, he was assured that Duggan’s handwritten note should alleviate his concerns, and he went through with the closing.
 

 An invoice was included with the documents the Rebars received from Cook’s at the closing on April 21, 2000. This invoice showed a “transfer fee” of $95. Also in April 2000, the Rebars and Cook’s executed a liquid-treatment contract that, like the Duells’ contract, was a “re-treatment-only” contract.
 

 Shortly after the April closing, Mr. Re-bar contacted Cook’s to discuss their contract. He wanted to upgrade from a “re-treatment-only” contract to a repair contract. However, the Rebars were not moving into the house until later in the summer, so it was decided that they would delay discussion of the termite-protection contract until that time. In August 2000, after the Rebars moved into the house, Duggan met with Mrs. Rebar and convinced her to change the liquid-treatment-contract they had executed in April 2000 to a termite-control contract specifying the use of Sentricon Colony Elimination System, a more expensive baiting product that did not require a liquid treatment of the property. The Sentricon termite-control contract executed by the Rebars specified that it was for re-treatment services only and did not cover damage caused by, or repairs necessitated by, a termite infestation. The contract also contained a provision that voided the re-treatment guarantee if the house had a wood-below-grade problem like the one at the Rebars’ house. The Sentricon termite-control contract also contained an arbitration agreement.
 

 During an inspection related to the Sen-tricon termite-control contract, Duggan indicated that there was damage in the front window sill that needed to be repaired before the Sentricon system could be installed. Duggan told Mrs. Rebar that the damage might have been from carpenter ants, but it was later discovered that it was termite damage.
 

 In September 2000, during the repair of the window sill, an active termite infestation was found in the Rebars’ house. After discovering the termites, Mrs. Rebar contacted Cook’s, but she was not satisfied with Cook’s proposed solutions to the infestation, and she contacted the Alabama Department of Agriculture and Industries (“ADAI”). The ADAI’s inspection of the house revealed an extensive termite infestation. The ADAI also informed the Re-bars of the wood-below-grade problem. At ADAI’s instruction, Cook’s retreated the property at no cost to the Rebars in May 2001. It was later discovered that the Sentricon system would not be effec
 
 *721
 
 tive at the Rebars’ house because of the wood-below-grade problem. The Rebars spent about $56,000 repairing the damage to the house caused by termites, and they alleged that the value of the house was diminished because of the damage.
 

 The Rebars sued Cook’s, seeking compensatory and punitive damages. Shortly before filing this action, on August 16, 2001, the Rebars sent Cook’s, along with their renewal payment for the Sentricon termite-control contract, an insert seeking to modify the Sentricon termite-control contract. The insert stated that acceptance of the payment and continued service would constitute acceptance of the terms of the addendum, which included a provision that stated that the parties were free to litigate any dispute. Cook’s accepted payment and continued service but nonetheless sought to compel arbitration of the Rebars’ action. The trial court denied Cook’s motion to compel arbitration, and Cook’s appealed that decision. On December 13, 2002, this Court affirmed the trial court’s order denying arbitration.
 
 Cook’s Pest Control, Inc. v. Rebar,
 
 852 So.2d 730 (Ala.2002).
 

 Cook’s filed a motion for a summary judgment, and on June 21, 2004, the trial court entered a summary judgment in favor of Cook’s on all claims. However, on July 21, 2004, the Rebars moved the trial court to alter, amend, or vacate the summary judgment and, on October 18, 2004, the trial court withdrew the summary judgment. The case then proceeded to trial before a jury. At the close of all the evidence, Cook’s moved for a judgment as a matter of law (“JML”) on all claims, and the trial court granted the motion as to the unjust-enrichment and failure-to-warn claims.
 
 [4]
 

 The remaining claims went to the jury, and the jury returned a general verdict of $100,000 in compensatory damages and $3 million in punitive damages. The jury did not indicate what portions of the award were to apply to each of the various claims. The judgment was entered on the verdict on May 25, 2005. On May 31, 2005, Cook’s filed a renewed motion for a JML, a motion for a new trial, and a motion for remittitur. The trial court heard these motions on August 19, 2005. The motion for a JML and the motion for a new trial were denied. The trial court left the $100,000 compensatory-damages award intact but reduced the punitive-damages award to $500,000, pursuant to the statutory cap on punitive damages in § 6-11-21, Ala.Code 1975.
 

 Cook’s appeals the denial of its motion for a JML and challenges the amount of compensatory and punitive damages. The Rebars cross-appeal, arguing that the trial court should not have reduced the punitive damages because, they argue, Cook’s waived the imposition of the statutory damages cap by not pleading it as an affirmative defense. The Rebars also argue that the trial court erred on certain evidentiary issues.
 

 Standard of Review
 

 In
 
 Mobile Infirmary Medical Center v. Hodgen,
 
 884 So.2d 801 (Ala.2003), this Court stated the standard of review applicable to a ruling on a motion for a JML, as follows:
 

 
 *722
 
 “Our standard of review for a renewed motion for a JML is well settled:
 

 “ ‘In reviewing the trial court’s ruling on a motion for a JML, an appellate court uses the same standard the trial court used in ruling on the motion initially. Thus, “ “we review the evidence in a light most favorable to the nonmovant, and we determine whether the party with the burden of proof has produced sufficient evidence to require a jury determination.’ ”
 
 Acceptance Ins. Co. v. Brown,
 
 832 So.2d 1, 12 (Ala.2001), quoting
 
 American Nat’l Fire Ins. Co. v. Hughes,
 
 624 So.2d 1362, 1366-67 (Ala.1993); see, also,
 
 Jim Walter Homes, Inc. v. Kendrick,
 
 810 So.2d 645, 649-50 (Ala.2001).’
 

 “Hicks v. Dunn,
 
 819 So.2d 22, 23-24 (Ala.2001). Thus, in reviewing the evidence in this case, we are required to construe the facts and any reasonable inferences that the jury could have drawn from them most favorably to [the nonmovant].”
 

 884 So.2d at 808-09.
 

 Discussion
 

 Cook’s argues that its motion for a JML should have been granted because, it says, the claims submitted to the jury were not supported by substantial evidence. The Rebars do not attempt to address this argument. Instead, the Rebars argue that Cook’s failed to preserve for review virtually all the issues it raises on appeal because, they say, Cook’s failed to object to the trial court’s jury instructions on the disputed claims.
 

 The Rebars argument is without merit. The Rebars cite several cases that stand for the proposition that to preserve for review an objection to an erroneous jury instruction the objection “must be made at the close of the court’s initial instructions to the jury, and it must be stated with sufficient clarity or specificity to preserve the error — in other words, an exception designating only the subject treated by the court in its oral charge is insufficient.”
 
 McElmurry v. Uniroyal, Inc.,
 
 531 So.2d 859, 859 (Ala.1988). The Rebars also point out that “ ‘[u]nchallenged jury instructions become the law of the case.’ ”
 
 Thompson Props. 119 AA 370, Ltd. v. Birmingham Hide & Tallow Co.,
 
 897 So.2d 248, 263 (Ala.2004) (quoting
 
 BIC Corp. v. Bean,
 
 669 So.2d 840, 844 (Ala.1995)). However, Cook’s is not claiming error in and seeking review of
 
 the
 
 trial court’s jury instructions. Cook’s is alleging that the claims that were submitted to the jury were not supported by substantial evidence, and, thus, it argues, it was entitled to a JML. To preserve its argument, Cook’s was required to follow the mandates of Rule 50, Ala. R. Civ. P., which governs a JML. Contrary to the Rebars’ contention, preservation of Cook’s argument does not require following the mandates of Rule 51, Ala. R. Civ. P., which governs objections to jury instructions.
 

 In
 
 King Mines Resort, Inc. v. Malachi Mining & Minerals, Inc.,
 
 518 So.2d 714 (Ala.1987), this Court held:
 

 “One who, on appellate review, seeks, on the ground of insufficiency of the evidence, the reversal of an adverse judgment and the entry of a judgment in his favor, must meet a two-pronged test: 1) He must ask for a directed verdict [now renamed a JML] at the close of all the evidence, specifying ‘insufficiency of the evidence’ (lack of proof) as a ground; and 2) he must
 
 renew
 
 this motion by way of a timely filed post-judgment motion for J.N.O.V. [now renamed a renewed motion for a JML], again specifying the same insufficiency-of-the-evidence ground. See Rule 50, [Ala.]R.Civ.P., and Committee Comments;
 
 Bains v. Jameson,
 
 507
 
 *723
 
 So.2d 504, 505 (Ala.1987); and
 
 Ritch v. Waldrop,
 
 428 So.2d 1 (Ala.1982).”
 

 518 So.2d at 716. Cook’s satisfied both requirements. Contrary to the Rebars’ allegation, Cook’s was not additionally required to object to the trial court’s jury instructions on the same grounds as set forth in its motions for a JML.
 

 The Rebars attempt to avoid this conclusion by alleging that “the trial court decided Cook’s JML motion using a fairly unique procedure.” (Rebars’ brief, at 25.) According to the Rebars, the trial court addressed the issues raised in Cook’s motion for a JML only during the charge conference when it considered the parties’ requested jury charges. However, it does not appear that this allegation accurately depicts the trial court’s actions, nor does it appear that it would be relevant if the allegation did so accurately depict those actions. First, only
 
 after
 
 the trial court heard considerable argument on Cook’s motion for a JML and purported to make various rulings on the motion did the trial court state:
 

 “So let’s go through all of the issues and figure out which ones — I think the easiest way to deal with the [JML] motion is going — is granted in part and overruled in part on the motion for judgment as a matter of law. I think the best way of dealing with what’s still here is to go through the jury charges as proposed.
 

 “We are now officially in charge conference, to the extent you have to say that. I am going to start and just for purposes of — I’ll start with the jury charges requested by plaintiffs and just go through them.”
 

 The trial court granted in part and overruled in part the motion for a JML before it started the charge conference. It appears that the trial court merely intended to use the charge conference as an efficient way to identify what claims were “still here.” The trial court did not use the charge conference to receive additional arguments or to make additional rulings on the motion for a JML. Furthermore, even if the trial court addressed the issues raised in the motion for a JML by considering the requested jury charges, the Re-bars do not clearly explain the relevance of this procedure. If the trial court decided to address the motion for a JML during the charge conference, that decision did not add an extra requirement to the two requirements for preservation of insufficiency-of-the-evidence claims set forth in
 
 King Mines Resort,
 
 supra. The Rebars do not cite any case that mandates any additional requirement for preserving an insufficiency-of-the-evidence claim in a situation like the present one. All the cases cited by the Rebars discuss only preserving issues for review concerning erroneous jury instructions under Rule 51, Ala. R. Civ. P., not claims set forth in a motion for a JML under Rule 50, Ala. R. Civ. P. Therefore, Cook’s insufficiency-of-the-evidence claims are properly before this Court because it moved for a JML at the close of all the evidence and it renewed this motion by way of a timely filed post-judgment motion.
 

 Next, we must decide whether each claim that was submitted to the jury was supported by substantial evidence. It appears that the jury was instructed on the following claims: fraudulent misrepresentation, fraudulent suppression, breach of contract, negligence (including negligent misrepresentation and negligent supervision and retention of employees), negligence per se based on an alleged violation of Ala. Admin. Code (Agriculture), Chapter 80-10-9, and promissory estoppel.
 
 [5]
 

 
 *724
 
 First, it appears that the Rebars attempted to base some of their claims on actions taken by Cook’s before it prepared the WIIR for the Rebars. However, the Rebars do not have standing to assert such claims.
 

 In
 
 Ray v. Montgomery,
 
 399 So.2d 230 (Ala.1980), the purchasers of a termite-infested house sued a termite-control company based on a termite-control contract the company had entered into with the prior owners of the home. In rejecting the purchasers’ claim, this Court explained:
 

 “There is no contractual obligation on the part of [the termite-control company] to the [purchasers of the home]. Protection under the service contract does not run to the owner of the property but to the contractual parties. The [purchasers] are not third-party beneficiaries under that contract as they were not intended beneficiaries. The contract was entered into for the purpose of protecting the house as the property of the [prior owners]. The [prior owners] were protecting their interest and investment and were not altruistically protecting the property for subsequent purchasers.”
 

 399 So.2d at 233.
 

 Also, in
 
 Keck v. Dryvit Systems, Inc.,
 
 830 So.2d 1 (Ala.2002), subsequent purchasers of a house sued the manufacturer, the distributor, and the installer of an exterior insulation-finishing system (“EIFS”), alleging that they had sustained damage based on the inability of the system to prevent water intrusion or to allow water to properly drain. This Court held:
 

 “[The defendants] did not enter into a contract to manufacture and apply the EIFS to a house owned by the [plaintiffs], As subsequent purchasers of the house, the [plaintiffs] had no relationship with, and no other contact with, the builder of the house or any of [the defendants]. Because the [plaintiffs] did not enter into a contract with [the defendants] to apply the EIFS to the house, because the [plaintiffs] were not the intended purchasers of the house when the EIFS was applied during the construction of the house, and because [the defendants] could not have anticipated when or if the [plaintiffs] would purchase the house, [the defendants] owed the [plaintiffs] no duty to manufacture and apply the EIFS with reasonable care.”
 

 830 So.2d at 10.
 

 In the present case, any actions relating to the house taken by Cook’s before the Rebars contracted to purchase the house were for the benefit of the Duells, not the Rebars. Cook’s owed the Rebars no duty based on these actions, and the Rebars’ purchase of the house did not gain them any protections under the termite-control contract between Cook’s and the Duells. Therefore, any contract or tort claims arising out of Cook’s relationship with the Duells before the Rebars contracted to purchase the house would necessarily have to be brought by the Duells, not the Re-bars, and Cook’s was entitled to a JML on any such claims.
 

 Next, to the extent that the Re-bars’ fraudulent-suppression, fraudulent-misrepresentation, or negligence claims are based on Cook’s preparation of the WIIR pursuant to the purchase contract for the home, the claims are not supported by substantial evidence.
 

 “A claim for fraudulent suppression requires that the plaintiff show: (1) that the defendant had a duty to disclose material facts; (2) that the defendant concealed or failed to disclose those
 
 *725
 
 facts; (3) that the concealment or failure to disclose induced the plaintiff to act; and (4) that the defendant’s action resulted in harm to the plaintiff.”
 

 Booker v. United American Ins. Co.,
 
 700 So.2d 1333, 1339 n. 10 (Ala.1997).
 

 “To establish a prima facie case of fraudulent misrepresentation, a plaintiff must show: (1) that the representation was false, (2) that it concerned a material fact, (3) that the plaintiff relied on the false representation, and (4) that actual injury resulted from that reliance. § 6-5-101, Ala.Code 1975;
 
 Crowder v. Memory Hill Gardens, Inc.,
 
 516 So.2d 602 (Ala.1987);
 
 International Resorts, Inc. v. Lambert,
 
 350 So.2d 391 (Ala.1977).”
 

 Boswell v. Liberty Nat’l Life Ins. Co.,
 
 643 So.2d 580, 581 (Ala.1994).
 

 “ ‘To establish negligence, the plaintiff must prove: (1) a duty to a foreseeable plaintiff; (2) a breach of that duty; (3) proximate causation; and (4) damage or injury.
 
 Albert v. Hsu,
 
 602 So.2d 895, 897 (Ala.1992).’ ”
 

 Brushwitz v. Ezell,
 
 757 So.2d 423, 432 (Ala.2000).
 

 Fraudulent-suppression, fraudulent-misrepresentation, and negligence claims all require the plaintiff to prove an injury or damage resulting from the defendant’s conduct. In the present case, the Rebars have failed to present substantial evidence indicating that they suffered an injury or damage as a result of any suppression or misrepresentation by Cook’s in preparing the WIIR. In
 
 Reeves v. Porter,
 
 521 So.2d 963 (Ala.1988), this Court held that “ ‘one suffers no damage where he is fraudulently induced to do something which he is under legal obligation to do, such as ... perform a valid contract.’ ” 521 So.2d at 968 (quoting 37 Am.Jur.2d
 
 Fraud and Deceit
 
 § 295, at 392-93 (1968) (emphasis omitted)). Furthermore, this Court stated that “ ‘[a] person who is induced by false representations to do what his legal duty requires him to do cannot recover therefor, because he suffers no legal injury.’ ”
 
 Reeves,
 
 521 So.2d at 968 (quoting 37 Am.Jur.2d
 
 Fraud and Deceit
 
 § 283, at 379 (1968)).
 

 In the present case, when the WIIR was prepared and presented to the Rebars at the closing, the deadline for the Rebars to terminate the purchase contract based on unsatisfactory conditions had passed. Furthermore, the performance of the contract was not contingent on the contents of the WIIR. The Rebars were contractually obligated to purchase the house from the Duells before they received the WIIR, regardless of the contents of the WIIR. Therefore, the Rebars have failed to present substantial evidence indicating that they suffered any injury because of any suppression or misrepresentation by Cook’s in preparing the WIIR.
 

 Moreover, the Rebars did not present substantial evidence satisfying the duty element of their negligence or fraudulent-suppression claims. Specifically, the Rebars did not present substantial evidence indicating that Cook’s had a duty to inform the Rebars of the wood-below-grade problem with the house when it prepared the WIIR or that Cook’s failed to fulfill any of its duties in preparing the WIIR. The WIIR explicitly limited Cook’s duty to a visual inspection of the house, and the disclaimers in the WIIR limited the scope of the WIIR “to deter-min[ing] the presence or previous presence of an infestation of the listed organisms and [was] not intended to be a report of damage.” The WIIR went on to state:
 

 “If visible evidence of aetive or previous infestation of listed organisms is reported, it should be assumed that some degree of damage is present. Evaluation of damage and any corrective action
 
 *726
 
 should be performed by a qualified inspector approved by the purchaser. This report is subject to all conditions enumerated on the reverse side and is issued without warranty, guarantee or representation, except as provided in Rule No. 80-10-9-.18, ALABAMA ADMINISTRATIVE CODE, or subject to any treatment guarantee specified below.”
 

 Therefore, preparing the WIIR did not impose a duty on Cook’s to inform the Rebars of the wood-below-grade problem with the house or to locate an active termite infestation that could not be found by a visual inspection.
 

 In addition, “[a]n action for suppression will lie only if the defendant actually knows the fact alleged to be suppressed.”
 
 McGarry v. Flournoy,
 
 624 So.2d 1359, 1362 (Ala.1993). Even if Dug-gan should have discovered an active termite infestation during his inspection, unless he actually did discover it, a claim of fraudulent suppression will not lie. There was no evidence indicating that Duggan actually discovered termites and suppressed that information on the WIIR.
 

 For the above-stated reasons, the JML for Cook’s is proper on the fraudulent-suppression, fraudulent-misrepresentation, and negligence claims to the extent that those claims are based on Cook’s preparation of the WIIR.
 

 Next, the Rebars did not present substantial evidence to support their general allegation that Cook’s was negligent per se for allegedly violating Ala. Admin. Code, Chapter 80-10-9, which contains the administrative regulations generally governing termite-control companies. “To establish negligence per se, a plaintiff must prove: (1) that the statute the defendant is charged with violating was enacted to protect a class of persons to which the plaintiff belonged; (2) that the plaintiffs injury was the kind of injury contemplated by the statute; (3) that the defendant violated the statute; and (4) that the defendant’s violation of the statute proximately caused the plaintiffs injury.”
 
 Dickinson v. Land Developers Constr. Co.,
 
 882 So.2d 291, 302 (Ala.2003). Cook’s states that “the evidence was undisputed that Cook’s did not violate any applicable statutes or regulations with respect to its inspections or treatments of the subject property.” (Cook’s brief, at 34.) The Rebars do not respond to this statement; they do not identify any specific provisions of Rule 80-10-9 that were violated; and they do not attempt to set forth any evidence that was presented at trial that satisfied the elements of negligence per se. Therefore, the trial court erred in denying Cook’s motion for a JML on the Rebars’ negligence per se claim.
 

 Next, Cook’s alleges that the Rebars did not present substantial evidence to support their claim that Cook’s committed fraudulent misrepresentation by allegedly representing to the Rebars that it was transferring the Duells’ liquid-barrier termite-control contract to the Rebars in exchange for an additional payment and, instead, inducing the Rebars to execute, in conjunction with the closing, a new liquid-barrier termite-control contract with what the Rebars say were less favorable terms. The primary difference between the two contracts was that the new liquid-barrier contract contained an arbitration clause and certain exclusions that were not present in the Duells’ contract. Both contracts were “re-treatment-only” contracts. The Rebars alleged that evidence of the misrepresentation included a notation on an invoice that Mr. Rebar received from Cook’s at the closing that referred to a $95 “transfer” fee. However, Cook’s argues that the Rebars did not present substantial evidence indicating that they reason
 
 *727
 
 ably relied on the alleged misrepresentation.
 

 In
 
 Massey Automotive, Inc. v. Norris,
 
 895 So.2d 215 (Ala.2004), this Court stated:
 

 “One of the earlier formulations of the reasonable-reliance standard was articulated in
 
 Torres v. State Farm Fire & Casualty Co.,
 
 438 So.2d 757 (Ala.1983), to which standard this Court ‘returned’ in
 
 Foremost Insurance [Co. v. Parham,
 
 693 So.2d 409 (Ala.1997)]. In
 
 Torres,
 
 the Court explained that ‘[i]n order to recover for misrepresentation, the plaintiffs reliance must, therefore, have been reasonable under the circumstances. If the circumstances are such that a reasonably prudent person who exercised ordinary care would have discovered the true facts, the plaintiffs should not recover.’ 438 So.2d at 759. Under
 
 Foremost Insurance,
 
 reliance can be declared unreasonable, as a matter of law, ‘where the undisputed evidence indicates that the party or parties claiming fraud in a particular transaction were fully capable of reading and understanding their documents, but nonetheless made a deliberate decision to ignore written contract terms’ that clearly contradicted the alleged misrepresentations. 693 So.2d at 421.”
 

 895 So.2d at 220.
 

 In the present case, the Rebars presented no evidence indicating that they could not read the termite-control contract they executed, that someone prevented them from reading the termite-control contract, or that they could not have understood the contract had they read it. The arbitration clause and exclusions, which were not in the Duells’ termite-control contract, were readily apparent in the new termite-control contract, and these written terms clearly contradicted the alleged representation by Cook’s that it was transferring the Duells’ termite-control contract to the Rebars. The Rebars presented no evidence concerning the transfer-fee notation on the Cook’s invoice presented at the closing that would support an inference that Cook’s made a misrepresentation about the scope of the termite-control contract the Rebars received at the closing that would warrant the Rebars’ disregarding the plain language of the contract. Therefore, the Rebars did not reasonably rely on any misrepresentation made by Cook’s concerning the contract, and the Rebars cannot recover for fraudulent misrepresentation based on their entering into the termite-control contract with Cook’s in April 2000. The trial court erred in denying Cook’s motion for a JML as to this claim.
 

 Next, the Rebars claimed that Cook’s fraudulently suppressed material facts about the wood-below-grade problem of the house and the history of that problem and that this suppression induced them to enter into the Sentricon termite-control contract, which was more expensive than the liquid-barrier treatment and completely inappropriate for their house. Cook’s fails to address this claim in its brief to this Court. Therefore, Cook’s waives any argument concerning this claim, and we cannot say it is entitled to a JML on this claim. See
 
 Tucker v. Cullman-Jefferson Counties Gas Dist.,
 
 864 So.2d 317, 319 (Ala.2003) (“ ‘An appeals court will consider only those issues properly delineated as such, and no matter will be considered on appeal unless
 
 presented and argued
 
 in brief.’ ” (quoting
 
 Braxton v. Stewart,
 
 539 So.2d 284, 286 (Ala.Civ.App.1988), citing in turn
 
 Ex parte Riley,
 
 464 So.2d 92 (Ala.1985))).
 

 Next, Cook’s argues that the Rebars did not present substantial evidence in support of their claim that Cook’s breached the April 2000 termite-control
 
 *728
 
 contract by failing to apply a liquid-termite re-treatment to the property immediately upon entering into the contract. “The elements of a breach-of-contract claim under Alabama law are (1) a valid contract binding the parties; (2) the plaintiffs’ performance under the contract; (3) the defendant’s nonperformance; and (4) resulting damages.”
 
 Reynolds Metals Co. v. Hill,
 
 825 So.2d 100, 105-06 (Ala.2002). The elements of a valid contract include: “ ‘an offer and an acceptance, consideration, and mutual assent to terms essential to the formation of a contract.’ ”
 
 Ex parte Grant,
 
 711 So.2d 464, 465 (Ala.1997) (quoting
 
 Strength v. Alabama Dep’t of Fin., Div. of Risk Mgmt.,
 
 622 So.2d 1283, 1289 (Ala.1993)).
 

 In the present case, the liquid-barrier contract executed by Cook’s and the Re-bars in April 2000 guaranteed that “during the term of this Guarantee” Cook’s would, among other things, “treat the soil with an approved product manufactured for the control of native Subterranean Termites.” Concerning the term of the contract, the contract stated: “This Guarantee is effective for a period of one (1) year following the initial treatment.” It is unclear from the contract when the initial treatment was to be performed.
 
 [6]
 

 Concerning this breach-of-contract claim, Cook’s argues that it did not breach the liquid-barrier contract because, it argues, this contract was extinguished by novation when the parties executed the Sentricon contract in August 2000. We disagree.
 

 “A novation is the substitution of one contract for another; a novation releases the party bound by the original contract. A novation extinguishes the preexisting obligation.”
 
 Golden v. Bank of Tallassee,
 
 639 So.2d 1366, 1369 (Ala.1994). “Novation requires: ‘(1) a previous valid obligation; (2) an agreement of the parties thereto to a new contract or obligation; (3) an agreement that it is an extinguishment of the old contract or obligation; and (4) the new contract or obligation must be a valid one between the parties thereto.’ ”
 
 Boh Bros. Constr. Co. v. Nelson,
 
 730 So.2d 132, 134 (Ala.1999) (quoting
 
 Warrior Drilling & Eng’g Co. v. King,
 
 446 So.2d 31, 33 (Ala.1984)).
 

 In the present case, it is undisputed that the liquid-barrier contract was a valid obligation and that the parties intended to enter into a new obligation when they executed the Sentricon termite-control contract. Furthermore, nothing in the record indicates that the parties intended to continue with a liquid-barrier treatment after they executed the Sentricon termite-control contract. In fact, the Sentricon termite-control contract states:
 

 “State regulations may require specific treatment standards for a conventional liquid barrier termite treatment. However, these standards will not be performed as part of this Agreement because the Sentricon System is a conceptually different type of termite treatment which does not involve a liquid barrier treatment.”
 

 However, the Sentricon termite-control contract is not valid if it was procured by fraud, and, if it is not valid, the purported extinguishment of the liquid-barrier contract would be ineffective. Therefore, because Cook’s has waived any argument relating to the Rebars’ claim that they were fraudulently induced to enter into the Sentricon termite-control contract, Cook’s argument on appeal that the liquid-barrier contract was extinguished by novation is without merit and Cook’s has failed to demonstrate to this Court that it was enti-
 
 *729
 
 tied to a JML on the breach-of-contract claim.
 

 Finally, like the fraudulent-suppression claim discussed earlier, Cook’s does not address the promissory-estoppel claim that was submitted to the jury. Therefore, Cook’s waives any argument concerning this claim. See
 
 Tucker v. Cullman-Jefferson Counties Gas Dist.,
 
 supra.
 

 Cook’s contends that if it is entitled to a JML on any but not all the Rebars’ claims that were submitted to the jury, then it is entitled to a new trial based on the “good count-bad count” rule. See
 
 Alfa Life Ins. Corp. v. Jackson,
 
 906 So.2d 143, 157 (Ala.2005) (“Because the jury returned a general verdict for the plaintiffs and the two ‘bad counts’ may have infected this verdict, we must reverse the judgment entered upon that verdict.”). We agree.
 

 In the present case, the jury returned a general verdict, without indicating which of the various claims it based its verdict upon. This Court cannot presume that the verdict was based solely upon the “good” counts, i.e., the claims that are supported by the evidence. The jury could have based its verdict, awarding compensatory and punitive damages, solely upon the “bad” counts, i.e., the claims that are not supported by the evidence. For this reason, we have no alternative but to order a new trial.
 

 Conclusion
 

 In conclusion, Cook’s is entitled to a JML on: (1) all the claims that are based on actions taken by Cook’s before it prepared the WIIR for the Rebars; (2) the fraudulent-suppression, fraudulent-misrepresentation, and negligence claims, to the extent those claims are based on Cook’s preparation of the WIIR; (3) the negligence per se claim; and (4) the fraudulent-misrepresentation claim based on the allegation that Cook’s represented to the Re-bars that it was transferring the Duells’ termite-control contract to the Rebars and, instead, induced the Rebars to enter into a new'termite-control contract, the terms of which, the Rebars say, were less favorable.
 

 Cook’s is not entitled to a JML on the claim that Cook’s fraudulently suppressed facts about the house and that this suppression induced the Rebars to enter into the Sentricon termite-control contract, the claim that Cook’s breached the liquid-barrier contract, or the promissory-estoppel claim that was submitted to the jury.
 

 Because this Court cannot presume that the jury’s general verdict was based solely upon the claims that were supported by the evidence, the trial court’s judgment is reversed and the case is remanded for a new trial. Our reversal of the judgment moots the issues whether the damages awarded were excessive and whether the remittitur of the punitive-damages award was proper. Furthermore, we do not address the Rebars’ arguments that the trial court erred on certain evidentiary issues because the disputed evidence may not be presented at the new trial. Therefore, the Rebars’ cross-appeal is dismissed as moot.
 

 1050029 — REVERSED AND REMANDED. .
 

 1050128 — APPEAL DISMISSED.
 

 COBB, C.J., and LYONS, STUART, SMITH, BOLIN, PARKER, and SHAW, JJ., concur.
 

 MURDOCK, J., dissents.
 

 [1]
 

 . Aycock, McClusky, and Pinckard were dismissed'as defendants on April 4, 2005.
 

 [2]
 

 . The complaint also alleged wantonness and breach of warranty. However, those claims were not submitted to the jury.
 

 [3]
 

 . It is unclear who, if anyone, was responsible for the delay in preparing and delivering' the WIIR.
 

 [4]
 

 . It appears from the record that Cook's motion for a JML was also granted on the fraudulent-suppression claim, but some of the trial court’s instructions to the jury relate to that claim. Likewise, the record indicates that the trial court appeared to grant Cook’s motion for a JML on the negligence per se claim, but the trial court likewise instructed the jury on this claim. Therefore, we are treating those claims as not having been disposed of by a JML.
 

 [5]
 

 . Although the Rebars did not assert a claim of promissory estoppel in their complaint, the
 
 *724
 
 trial court's instructions included a charge on promissory estoppel.
 

 [6]
 

 . Ultimately, at the instruction of the ADAI, Cook's did treat the property in May 2001.