**James Brandon CHERRY**

v.

**PINSON TERMITE AND PEST CONTROL, LLC, and Jerry Thomas Pinson.**

1140369.

Supreme Court of Alabama.

April 29, 2016.

558

■■■■■■■■■■■■■■■■■

Thomas F. Campbell and Robert S. Walker of Campbell Law PC, Birmingham, for appellant.

Clifton E. Slaten, Edward C. Hixon, and Jason J. Baird of Slaten Law, P.C., Montgomery, for appellees.

MURDOCK, Justice.

James Brandon Cherry appeals from a summary judgment entered against him and in favor of Pinson Termite and Pest Control, LLC ("Pinson Pest Control"), and Jerry Thomas Pinson by the Montgomery Circuit Court. We reverse and remand.

## I. Facts

On August 29, 2011, Cherry purchased a house located on Cloverdale Road in Montgomery from Alan Osborn. The contract between Cherry and Osborn required Osborn to provide Cherry a Wood Infestation Inspection Report ("WIIR"). The rule applicable to such reports, Ala. Admin. Code (Agriculture), Rule 80–10–9–.18, provides, in pertinent part:

"(1) The official Alabama wood infestation inspection report, which may be required as a condition of sale financing or refinancing of property shall be the written instrument for the purpose of determining the visible presence of an active or previous infestation of wood destroying organisms in an existing structure. The inspection conducted for issuance of this report shall only be performed by a qualified inspector and the report shall only be completed and issued by a person certified and permitted to engage in the category of structural pest control work involving control of wood destroying organisms. The inspection must be conducted so as to ensure examination of visible accessible areas in accordance with accepted procedures. While such an inspection may reveal wood destroying organisms, there are inaccessible areas where concealed infestations and/or damage may not be discovered. Inspection of inaccessible areas is not required. Such instrument shall carry a guarantee that if an infestation of wood destroying organisms from which apparent freedom is certified, is found within ninety (90) days from date of issuance, the infested structure(s) shall be treated by the licensee, free of charge....

" ....

"(4) The official Alabama wood infestation inspection report is evidence of an active or previous infestation of wood destroying organisms that were visible and accessible to a qualified inspector on the date the inspection was performed. The permittee is responsible for the accuracy of the inspection and the report as to evidence of an active or previous infestation of wood destroying organisms on the date of inspection."

Osborn had a renewable termite-services contract with Single Oak Termite and Pest Control, LLC ("Single Oak"), that was subsequently assumed by Pinson Pest Control in a contract executed on November 29, 2010. It is undisputed that this "termite bond" was transferable from Osborn to Cherry, but the parties dispute whether it was, in fact, transferred to Cherry.

Pinson, who formerly worked for Single Oak, performed the inspection for the WIIR on August 25, 2011. The WIIR did not contain any notice that the property had received only a partial treatment for termites because certain areas were not accessible, and it gave no indication that there was any evidence of active termite infestation or past termite damage to the

property. A copy of the termite bond was not attached to the WIIR.

In October 2011, when Cherry was remodeling the house, he discovered extensive termite damage. Cherry contacted the Alabama Department of Agriculture and Industries ("ADAI"), the agency that regulates pest-control operators in Alabama, concerning his discovery. An ADAI inspector inspected the house on March 13, 2012. The inspector found signs of termite damage to accessible portions of the house and also determined that a substantial portion of the house was not accessible for treatment because the crawlspace was too low and because some of the foundation was attached to the porch. On March 27, 2012, ADAI sent Pinson a letter informing him that it had "observed findings of subterranean termite damage" that were not mentioned on the WIIR and that, although the WIIR "indicates the structure was treated by your company, ... we did not observe all mechanics of subterranean control work." The letter stated that ADAI would contact Pinson about performing "a joint evaluation of the structure and monitor additional treatment(s)."

On April 11, 2012, ADAI inspector Steve Segrest monitored Pinson's re-treatment of the house. On the same date, Cherry and Pinson signed a contract that provided:

"This Contract is an agreement between Brandon Cherry and Jerry Pinson. Mr. Pinson will pay $13,960.87 based on the estimate provided by Robbie Silas Contracting, LLC., as well as $500 of incurred lawyer fees. Mr. Pinson will also pay a 1–year termite bond on the property located at ... Cloverdale Rd., Montgomery, AL. 36104. If the contractor's estimate and lawyer fees are not paid in full by May 8, 2012, this contract is void and it will be turned over to Brandon Cherry's lawyer. In addition, the front porch is to be taken care of by a contractor of Jerry Pinson's choosing.

"By signing this agreement, both parties agree to the terms set forth in this contract."

On May 15, 2012, Stephen M. Langham, an attorney for Cherry, sent Pinson a letter that provided:

"Please be advised that the above-referenced matter has been turned over to this office to commence legal action if necessary. By the terms of your contract, you were to pay Mr. Cherry the sum of $13,960.87 for repairs plus the additional sum of $500.00 he incurred in attorney's fees. This was due by May 8, 2012; and payment is thus delinquent by a week. This has resulted in additional expense to Mr. Cherry relative to interest on his construction loan, etc.

"He is still willing to settle his claim for this amount, but you have to act immediately. Also, if you have not turned this matter over to your insurance carrier, you should do so immediately."

There is no evidence in the record indicating that Pinson paid Cherry any amount in accordance with the contract.

On May 21, 2012, ADAI sent Cherry a letter advising that it had supervised Pinson's re-treatment of the house and that if Cherry had any question he should contact ADAI within 10 days of receiving the letter. If he did not contact ADAI, the letter stated, ADAI would "assume that the matter has been resolved and we will close our file." There is no record of any further contact between Cherry and ADAI.

On September 30, 2013, Cherry commenced an action in the Montgomery Circuit Court against Single Oak, Pinson Pest Control, and Pinson alleging fraud; negligence; negligent hiring, training, and supervision; and breach of contract and

seeking "equitable relief pursuant to the 'made whole' doctrine."

On April 3, 2014, Single Oak filed a motion for a summary judgment on the ground that "Single Oak had no involvement with the treatment of the Plaintiff's home at ... Cloverdale Road, Montgomery, Alabama 36104, either before or after [Cherry] purchased the home on or about August 29, 2011."

On July 7, 2014, Pinson Pest Control and Pinson (hereinafter referred to as "the Pinson defendants") filed a "Motion for *Partial* Summary Judgment and Motion for Leave to Supplement Upon Receipt of Witness Deposition Transcripts." (Emphasis added.) In their brief in support of their motion, the Pinson defendants described the circumstances of the April 11, 2012, contract as follows:

> "After taking possession of the house, [Cherry] began remodeling. During that process he discovered termite damage in different areas of the house. He reported these findings to Pinson. After conferring with [Cherry] regarding the alleged termite damage to various areas of the house, Pinson signed a contract with [Cherry] agreeing to pay $13,960.87 for repairs based upon an estimate obtained by [Cherry] from Robbie Silas Contracting. The contract further provided that Pinson would make repairs to the front porch with a contractor of Pinson's choosing."

The Pinson defendants made two arguments in their brief as to why they were entitled to a summary judgment concerning certain claims asserted against them by Cherry. First, they argued that Cherry lacked any basis for making a claim arising out of alleged acts by the Pinson defendants occurring before he purchased the house in 2011. Second, they contended that Cherry had no basis to assert "claims under the contract purchased by Alan Osborn because the [termite-protec-

tion] contract was never transferred [to Cherry] or renewed." The motion and brief presented no other arguments.

On July 24, 2014, Cherry filed his opposition to the summary-judgment motions from all the defendants. He filed a supplemental brief in opposition to the defendants' motions on August 4, 2014. Those responses contained no mention of the April 11, 2012, contract.

On August 5, 2014, the trial court held a hearing on the motions. In the hearing, the trial court first determined that Single Oak was not involved in providing termite treatment for the house, and accordingly it entered a summary judgment in favor of Single Oak dismissing all claims against it. The trial court then addressed the summary-judgment motion filed by the Pinson defendants as follows:

> "MR. HICKSON [attorney for the Pinson defendants]: We have partial summary judgment on behalf of Pinson, based on similar theory same theory, same caselaw, is that there's a termite contract that was transferred from the seller, Alan Osborn to—
>
> "MR. SLATEN [second attorney for the Pinson defendants]: Not transferred.
>
> "MR. HICKSON: Excuse me. Correct. It was purchased by Alan Osborn ... before Mr. Cherry bought this house. Mr. Pinson—
>
> "THE COURT: Well, did Mr. Pinson make some representations to Mr. Cherry?
>
> "MR. SLATEN: The only representations he would have made to Mr.—
>
> "THE COURT: I didn't say only, now, I said did he make any.
>
> "MR. HICKSON: Not through that contract. Through the wood infestation report he had completed prior to the purchase of the house. Yes, he completed that form, did that inspection.

"THE COURT: Was he truthful?

"MR. HICKSON: Well, he missed some—area of damage.

"THE COURT: Well, that means he wasn't truthful, then. In his report he said—

"MR. HICKSON: Or he made a mistake, yes, sir.

"THE COURT: In his report he said he covered everything.

"MR. HICKSON: Well, obviously, there's a question of fact on that arising out of the wood infestation report. Our position is there's no duty arising out of the contract for Mr. Osborn written by Single Oak and/or Pinson, because—

"THE COURT: Well, I thought you—*I thought your argument would be that Mr. Cherry had settled up his differences with Mr. Pinson for about $13,000 when they went up to the Department of Agriculture and had talks and negotiations up there.*

"MR. SLATEN: *We actually thought about moving to enforce that agreement,* Your Honor.

"THE COURT: Well, I'm—that's the way I see it. You don't see that?

"MR. HICKSON: Well, *he hasn't—he didn't pay that and he didn't adhere to that agreement.*

"THE COURT: Well, I mean, the only thing he can do now is sue on the contract.

"MR. SLATEN: That'd be our position.

"MR. HICKSON: Yes, sir.

THE COURT: That's the way I see it. I don't—

"MR. HICKSON: But what our . . . argument on summary judgment is he can't sue to enforce this contract between Pinson and Osborn, the seller of the home. The only duties he had was out of the wood infestation report.

"THE COURT: All right. Well, after they discovered the damages, termite damages, Mr. Cherry wrote a letter to the Department of Agriculture. They got involved and this guy, Steve what?

"MR. SLATEN: Steve Se[grest], Judge.

" . . . .

"THE COURT: All right. They settled up. They settled up.

"MR. SLATEN: Right.

"MR. POWELL [attorney for Cherry]: They thought they were—

"THE COURT: No. They had a contract, did they not? Did they have an agreement? Did they reach an agreement?

"MR. POWELL: They had an agreement [in] principle that was not performed.

"THE COURT: Well, I know, but you can only sue on the contract, now.

"MR. POWELL: Well, that's, that is what Mr. Pinson, that's what Mr. Cherry thought the damage he had. And it became more extensive when he began doing other repairs.

"THE COURT: Well, I don't know, now.

"MR. POWELL: That's what the evidence is going to show.

"THE COURT: Well, no, I think the evidence is going to show that they had reached an agreement. Didn't the [Department of A]griculture people go out there and inspect it?

"MR. POWELL: Yes, they did. Your Honor.

"THE COURT: Didn't he agree? See, he didn't meet you that day, did he? He met you later.

"MR. POWELL: Right.

"THE COURT: You can't come in, now, okay, and change things. That's what you're trying to do.

"MR. POWELL: I don't believe we're trying to change things, Your Honor.

"THE COURT: Yeah, because he agreed to settle it, now.

"MR. POWELL: Based on the damage[ ] he discovered at that point.

"THE COURT: Huh?

"MR. POWELL: There's more damage[ ] discovered, though.

"THE COURT: Well, they should have discovered it all.

"MR. POWELL: It's like a back injury, when it gets worse, it goes up the spinal cord. After you get a fusion, you know, it's more widespread.

"THE COURT: I don't think it's like a back injury.

"MR. POWELL: Well, not exactly like it, but there's more damage[ ] that's been discovered.

"THE COURT: Now, that's a bad analogy.

MR. SLATEN: Your Honor, when Mr.—when we took Mr. Cherry's deposition on July 2, we got started about 4 o'clock and went until about 6. He presented us $125,000 estimate that he had prepared on July 2—1 or 2. I asked him at that point, how did you come up with this estimate. And he said, this estimate is based on what Mr. Campbell, his attorney, told him he had to do to bring it up to the termite code and so he put together an estimate completely excavating the house and everything else. But he had a man to do an estimate for him. They agreed to it. Our client, for whatever reason, did not honor the deal, I think, probably because of his diabetic condition, because we've had difficulty communicating with him. He'll communicate so long, then won't. But that's our position. We had a contract, and *we thought about actually moving to enforce it.*

"MR. POWELL: I don't have the contract in front of me. It doesn't [say], though, that if it's not paid within two weeks that it's moot. We don't have a contract.

"THE COURT: No. You can't write contracts like that.

"MR. POWELL: He did. Well, then the whole thing's invalid. The whole thing's invalid.

"MR. HICKSON: Mr. Cherry wrote the contract.

"THE COURT: If there's a meeting of the mind, it's a meeting of the mind.

"MR. HICKSON: And the contract was construed against the [drafter], which is Mr. Cherry.

" . . . .

"THE COURT: Well, let's assume all of this is true.

"MR. POWELL: Well, we've got a fact question.

"THE COURT: Well, no, we don't, because he settled up with Mr. Pinson.

"MR. POWELL: Your Honor, I think there is a disputed fact whether or not there was a—

"THE COURT: No, no. He settled this claim with Mr. Pinson.

"MR. POWELL: Just based on the repairs—

"THE COURT: He settled this claim. He went through an administrative process and settled this claim.

"MR. POWELL: What administrative process?

"THE COURT: At the Department of Agriculture.

"MR. POWELL: I don't think he did anything. I mean, he just had the Department of Agriculture to come out there and look at the—

"THE COURT: And they had an agreement. They had an agreement.

"MR. POWELL: His agreement was—

"THE COURT: All right. I'll grant summary judgment to Mr. Pinson. Now, what's left?

"MR. HICKSON: We don't have anything else, Your Honor.

"THE COURT: All right. You can take it up with the Court of Civil Appeals, but I've looked at it, thought about it and that's the way I see it . . . ."

(Emphasis added.) The trial court then entered a summary judgment in favor of the Pinson defendants, concluding that Cherry had settled all of his claims for termite damage in the April 11, 2012, contract.

On August 15, 2014, the trial court entered separate summary judgments for all defendants on all claims. The order entering a summary judgment for the Pinson defendants provided:

"This cause having come before this Court on all pending motions, and the Court having heard arguments from counsel for all parties and having duly considered the same, this Court finds and orders that summary judgment is due to be and is hereby granted to Defendants Pinson Termite and Pest Control, LLC and Jerry Thomas Pinson pursuant to Rule 56, Ala. R. Civ. P. The Court further orders this judgment as final pursuant to Rule 54(b), Ala. R. Civ. P. Costs taxed as paid."

On September 11, 2014, Cherry filed a motion to alter, amend, or vacate the summary judgment entered in favor of the Pinson defendants. The motion was denied by operation of law pursuant to Rule 59.1, Ala. R. Civ. P., on December 10, 2014.

Cherry appeals the summary judgment against him and in favor of the Pinson defendants. Cherry does not challenge in this appeal the summary judgment entered in favor of Single Oak.

## II. Standard of Review

"Our standard of review for a summary judgment is as follows:

" 'We review the trial court's grant or denial of a summary-judgment motion *de novo,* and we use the same standard used by the trial court to determine whether the evidence presented to the trial court presents a genuine issue of material fact. *Bockman v. WCH, L.L.C.,* 943 So.2d 789 (Ala.2006). Once the summary-judgment movant shows there is no genuine issue of material fact, the nonmovant must then present substantial evidence creating a genuine issue of material fact. *Id.* "We review the evidence in a light most favorable to the nonmovant." 943 So.2d at 795. We review questions of law *de novo. Davis v. Hanson Aggregates Southeast, Inc.,* 952 So.2d 330 (Ala.2006).' "

*Lloyd Noland Found., Inc. v. HealthSouth Corp.,* 979 So.2d 784, 793 (Ala.2007) (quoting *Smith v. State Farm Mut. Auto. Ins. Co.,* 952 So.2d 342, 346 (Ala.2006)).

## III. Analysis

### A. Due Process

Cherry's primary argument is that the trial court violated due process by entering a summary judgment for the Pinson defendants on all of his claims against them on a basis not argued by the Pinson defendants and when they had requested a judgment as to only some of Cherry's claims against them. Cherry notes that the record is clear that the Pinson defendants moved for a *partial* summary judgment only and that in that motion they did not argue that Cherry's claims were precluded by April 11, 2012, contract signed by Cherry and Pinson. The Pinson defendants counter that Cherry has not demonstrated that he was actually prejudiced by any purported lack of notice as to the ground for the summary judgment and that, in any event,

"Cherry had adequate opportunity to argue his case at the August 5, 2014, summary judgment hearing."

■ A previous settlement of claims is an affirmative defense to an action. The Pinson defendants did not assert such a defense in their motion for a partial summary judgment or in the brief accompanying the motion. Indeed, their brief described the facts pertaining to the April 11, 2012, contract as the Pinson defendants understood them, and nowhere in that rendition did the Pinson defendants indicate that they considered that contract to be a settlement of the claims being asserted against them by Cherry. We cannot affirm a summary judgment entered under such circumstances.

The fact that Cherry's counsel attempted to answer the trial court's invocation of the April 11, 2012, contract at the summary-judgment hearing did not cure the due-process error. Cherry had no notice before the hearing that the April 11, 2012, contract would be a topic of argument and therefore did not have an opportunity to prepare an adequate response to an argument concerning the contract. Moreover, the colloquy in the record shows that the trial court ignored and even cut off the protestations of Cherry's counsel that there were issues of fact concerning the meaning and effect of the April 11, 2012, contract. Cherry's postjudgment motion likewise did not cure the due-process defect; the trial court did not even respond to that motion. In short, Cherry was not given an adequate opportunity to present substantial evidence creating a genuine issue of fact concerning the effect of the contract on Cherry's claims against the Pinson defendants.

*B. The April 11, 2012, Contract*

■ Even if the trial court had afforded Cherry an adequate opportunity to be heard concerning the argument that the April 11, 2012, contract effectively settled his claims against the Pinson defendants, the entry of a summary judgment on that basis still would not have been proper on the facts or the law. In the hearing on the motions for a summary judgment, the trial court indicated that it believed that "Mr. Cherry had settled up his differences with Mr. Pinson for about $13,000 when they went up to the Department of Agriculture and had talks and negotiations up there." There is no evidence in the record, however, to support the notion that ADAI facilitated a settlement of the claims between Cherry and Pinson. It is true that Cherry and Pinson signed the April 11, 2012, contract the same day Pinson re-treated Cherry's house under the supervision of an ADAI inspector, but the only connection between the two events appears to be that Pinson, Cherry, and the inspector were in the same place on the same day.

The April 11, 2012, contract is not a clearly drafted agreement. By the terms of the contract, Cherry did not expressly promise anything in return for Pinson's commitment to pay certain amounts. The contract simply states that if Pinson did not pay, the contract would be "turned over" to Cherry's lawyer.

■ Even if the contract is construed as one in which Pinson promised to pay a certain amount in exchange for Cherry's promising not to file an action against Pinson based on the termite damage to his house (as the Pinson defendants now urge on appeal), Cherry's promise was unenforceable without Pinson's payment. " 'If mutual promises be the mutual consideration of a contract, then each promise must be enforceable in order to render the other enforceable.' " *Marcrum v. Embry,* 291 Ala. 400, 404, 282 So.2d 49, 52 (1973) (quoting *Standard Oil Co. v. Veland,* 207 Iowa 1340, 1343, 224 N.W. 467, 469 (1929)). By its own terms, the contract was "void"

unless Pinson made the required payment by May 8, 2012. All parties concede that Pinson never paid Cherry any amount. Thus, there is no enforceable contract.

In sum, the April 11, 2012, contract provides no basis for a summary judgment in favor of the Pinson defendants.

### C. The Pinson Defendants' Arguments for Summary Judgment

We now turn to the arguments the Pinson defendants did make in support of a summary judgment. Cherry claims that the Pinson defendants violated duties based upon: (1) the WIIR; (2) the termite-bond contract issued to Osborn; (3) and administrative rules issued by ADAI. His claims of fraud, negligence, negligence per se, and breach of contract stem from those sources of duty. The Pinson defendants respond that they did not owe a duty to Cherry flowing from any of those sources. We discuss each in turn.

#### 1. The WIIR

Cherry argues that "[t]he WIIR issued to Cherry failed to contain the notice required by the regulation that the Home had received only a partial treatment and failed to meet the minimum clearance requirements for performing termite treatments and inspections.... In addition, the WIIR falsely indicated no evidence of active or previous [wood-destroying organism] activity or damage."

Cherry contends that he requested a WIIR as a condition for purchasing the house and that he relied upon the representations in the WIIR in making the purchase.

It is undisputed that the WIIR issued to Cherry did not indicate the presence of any termite damage in the house. It indicated that the entire house had been treated for termites, while failing to note that a substantial portion of the house was not accessible for treatment. Accordingly, there is substantial evidence that the WIIR failed to meet the requirements of Ala. Admin. Code (Agriculture), Rule 80–10–9–.18. We therefore decline to uphold the summary judgment insofar as it relates to Cherry's claims based on the WIIR.

#### 2. The Termite–Bond Contract

As we recounted in the rendition of the facts, Osborn had a renewable termite-bond contract with Single Oak that was subsequently assumed by Pinson Pest Control in a contract executed on November 29, 2010. It is undisputed that this termite bond was transferrable from Osborn to Cherry. Under Ala. Admin. Code (Agriculture), Rule 80–10–9–.16(5), a termite-service-treatment provider must provide its customers with an annual "signed report of each inspection showing the conditions of the property with respect to the presence or absence of subterranean termites." This report also must contain a waiver form "[w]henever it is impossible or impractical to treat one or more areas of the structure in accordance with the minimum requirements for the control of subterranean termites as set forth in Rule 80–10–9–.20." Ala. Admin.Code (Agriculture), Rule 80–10–9–.16(4). It is undisputed that Cherry did not receive such a waiver form, either with the WIIR or thereafter, even though substantial portions of his house were not accessible for treatment. Cherry thus maintains that the Pinson defendants "constructively promised that minimum standards were met or would be, and that all areas were accessible to treat and inspect, and [that] there was no damage."

The effective date of the termite bond—signed by Pinson and Osborn—was November 29, 2010. The termite bond stated that "[t]his agreement is renewable from year to year upon payment by the custom-

er of an annual renewal fee of $100.00 . . . which is due one year from the effective date and thereafter on the anniversary date."

Cherry argues that the termite bond was renewed by the WIIR, which was issued on August 25, 2011, and signed by Cherry on August 29, 2011. Cherry notes that the WIIR referenced the termite-bond contract in noting that the house had been treated for termites by Pinson Pest Control in November 2010 and that the "Contract Expiration Date" was November 2011. The WIIR also stated: "The present treatment contract(s) is/are . . . Transferable to any subsequent property owner on or before the expiration date above. Company must be contacted to transfer contract."

The Pinson defendants argue that there is no evidence in the record to support Cherry's claim that he did what was necessary to transfer the termite-bond contract. They say there is no evidence indicating that Cherry called Pinson or Pinson Pest Control to renew the contract and that there is no evidence indicating that Cherry paid the $100 renewal fee.

The Pinson defendants' argument is undermined by Pinson's own testimony. Pinson testified that an inspection performed for the WIIR also could serve as an inspection for renewal of the termite-bond contract "if it was close to the—to the— the date of his renewal."[1] More importantly, Pinson admitted that he sent a renewal notice to Cherry in 2012 for the termite-bond contract and that, per his "normal business practices," the only reason such a renewal would have been generated is if "the renewal for 2011 had already been paid."

In short, Pinson's testimony created a genuine issue of fact as to whether Cherry renewed the termite-bond contract for 2011. If Cherry did so, then the Pinson defendants had duties toward Cherry established by the termite-bond contract. Therefore, a summary judgment is not proper on Cherry's claims that are based on the termite-bond contract.

### 3. The ADAI Rules

Cherry contends that the ADAI rules imposed duties upon the Pinson defendants concerning how Pinson performed inspections and treatments on Cherry's house and that the Pinson defendants failed to fulfill those duties. The Pinson defendants do not dispute that the ADAI rules impose duties regarding pest-control services. They argue that, if those duties flowed to anyone, it was to Osborn rather than Cherry because the termite-bond contract was executed by Osborn and it was not renewed with Cherry. As we concluded in the immediately preceding subpart of this opinion, however, there is a genuine issue of fact as to whether Cherry renewed the termite-bond contract.

The Pinson defendants also contend that Cherry's assertions pertaining to the ADAI rules only go to his claim alleging negligence per se.

" 'To establish negligence per se, a plaintiff must prove: (1) that the statute the defendant is charged with violating was enacted to protect a class of persons to which the plaintiff belonged; (2) that the plaintiff's injury was the kind of injury contemplated by the statute; (3) that the defendant violated the statute; and (4) that the defendant's violation of the statute proximately caused the plaintiff's injury.' "

*Cook's Pest Control, Inc. v. Rebar*, 28 So.3d 716, 726 (Ala.2009) (quoting *Dickin-*

---

1. As we noted in the rendition of the facts, the WIIR inspection was performed on August 25, 2011; the termite-bond contract was due to expire on November 29, 2011.

son v. *Land Developers Constr. Co.*, 882 So.2d 291, 302 (Ala.2003)). The Pinson defendants contend that this claim fails because Cherry "cannot prove damages. It is undisputed that the subject property has no active termites."

The Pinson defendants did not present this argument in the trial court. Regardless, given that the ADAI rules required Pinson to disclose any "active or previous infestation of wood destroying organisms in an existing structure," Ala. Admin. Code (Agriculture), Rule 80–10–9–.18(1), and given the fact that it is undisputed that there was termite damage in Cherry's house, Cherry potentially could prove damages stemming from the Pinson defendants' failure to follow the ADAI rules.

### IV. *Conclusion*

Based on the foregoing, we conclude that the trial court erred in entering a summary judgment against Cherry and in favor of the Pinson defendants. That judgment is reversed and the cause remanded.

REVERSED AND REMANDED.

BOLIN, MAIN, and BRYAN, JJ., concur.

MOORE, C.J., concurs in the result.